THE STATE OF OHIO, APPELLEE, *v.* WILCOX, APPELLANT.

[Cite as State v. Wilcox (1974), 40 Ohio App. 2d 380.]

(No. 73AP-475—Decided May 14, 1974.)

*Mr. James J. Hughes, Jr.,* city attorney, and *Mr. Daniel W. Johnson,* city prosecutor, for appellee.

*Messrs. Wilcox, Schlosser & Schneider* and *Mr. Thomas J. Mirras,* for appellant.

WHITESIDE, J. This is an appeal from a judgment of the Franklin County Municipal Court which found defendant guilty upon a charge of speeding and imposed a fine of $25 and costs.

Defendant was operating his yellow Lincoln eastbound on West Broad Street just west of the I-270 interchange and was "clocked" at 56 miles per hour by a radar device mounted in a state highway patrol car which was proceeding westbound on West Broad Street in the vicinity of the I-270 interchange. The speed limit in the area is 45 miles per hour.

The highway patrolman testified that he had his radar device set for automatic and that it "locked in" at the speed of 56 miles per hour and that he then observed the traffic and decided that defendant's vehicle was the one which had activated the radar device. Defendant proceeded onto the I-270 southbound ramp and proceeded southbound on I-270. The officer made a left turn onto the same ramp and stopped defendant some three miles further south on 1-270.

In the interim, the officer had reset his radar device from 45 miles per hour to 60 miles per hour.

Defendant also presented the testimony of a former highway patrolman who testified that he was familiar with the device in question and that an order had been issued not to utilize the device on automatic in a moving vehicle because of discrepancies resulting from such use. He also testified as to other frailties of the device.

In support of his appeal, defendant raises two assignments of error as follows:

1. "That the verdict was against the manifest weight of the evidence."

2. "That prejudicial error occurred when the Judge took improper judicial notice that affected the final disposition of the case."

Although defendant made no objection to the introduction of the evidence concerning the readings from the radar device, he contends that, under the circumstances of this case, such evidence is insufficient to support a finding that defendant was, in fact, travelling at the speed of 56 miles per hour or any other speed in excess of the *prima facie* speed limit so that the judgment is against the manifest weight of the evidence.

The admissibility into evidence of a speed reading ob-

tained by a radar speed meter without independent expert testimony as to the nature and function of, or the scientific principles underlying such speed meter has been firmly established in Ohio by *East Cleveland* v. *Ferell* (1958), 168 Ohio St. 298. However, we are not here concerned with a question of whether evidence is admissible, but whether evidence under the unique circumstances hereof is of sufficient weight to permit a finding that the reading on the radar was the speed of the defendant's vehicle.

The issue here is not the same as that involved in *East Cleveland*. In that case, the radar speed-detecting device was stationary; whereas, the vehicle "clocked" was moving. In this case, the radar device, being mounted on the patrol car, was moving in the opposite direction of defendant's vehicle so that they were approaching one another at some speed. The speed at which the patrol car was moving is not indicated by the evidence.

In *East Cleveland, supra* at 299, 300, it is stated:

"Radar devices, as they are used today, are of two general types. That which is used by the military, commonly known as the 'pulse' type radar, operates by sending forth at regular intervals a beam of radio microwaves which, when they come in contact with the object to be detected, are reflected or bounced back to the receiver. The waves move in both directions at the speed of light. Thus, by computing the time interval between sending and receiving, the distance of the detected object may be determined, and, by computing distance changes over two or more time intervals, the speed of movement of the object can be learned.

"The radar speed-detecting devices commonly used in traffic control operate on what is known as the Doppler effect and utilize a continuous beam of microwaves sent out at a fixed frequency. The operation depends upon the physical law that when such waves are intercepted by a moving object the frequency changes in such a ratio to the speed of the intercepted object that, by measuring the change of frequency, the speed may be determined. See The Scientific Reliability of Radar Speedmeters, by Dr. John M. Kopper, 33 North Carolina Law Review, 343.

"The Doppler effect, which has been used for over a century in determining the speed of stars and for over a decade in measuring the speed of airplanes and their height above the ground, has been experienced by probably every motorist when driving past a car whose horn is being sounded. The pitch or frequency of the sound falls suddenly just as the vehicle is passed.

"In operation, the radar device, which, according to 1 Underhill's Criminal Evidence (5 Ed.), 280, Section 154, is now used in 43 states, the District of Columbia and Hawaii, is set up along the side of a road or street, usually in or upon a parked police car, with the beam being played along the highway. When a moving vehicle crosses that beam, the speed of the vehicle is registered on a graph or calibrated dial on the meter device. * * *"

In *East Cleveland*, the Supreme Court held that it was not necessary to present expert testimony with respect to the construction of a radar speed meter and its method of operation in order to qualify testimony as to a speed reading taken from such a radar speed meter. However, it would appear that the decision is limited to radar speed-detecting devices operating on what is known as the Doppler effect. The "Doppler effect" is a recognized scientific principle and is defined in *Webster's Third New International Dictionary* (1961), as follows:

"* * * a change in the frequency with which waves (as sound, light, or radio waves) from a given source reach an observer, the frequency decreasing with the speed at which source and observer move away from each other and increasing with the speed at which they move toward each other so that the pitch of a sound is apparently raised or lowered as the source and the observer move toward or away from each other * * *."

From this definition, it is apparent that, when two objects are moving toward each other, and a radar speed-detecting device using the Doppler effect is mounted on one of them, this device will measure the speed at which they move toward each other. This necessarily is their combined speed, not the speed of either one. In other words, utilizing solely the Doppler effects, a radar speed meter mounted on

a patrol car moving at 30 miles per hour and detecting an automobile moving in the opposite direction at 40 miles per hour will register 70 miles per hour, which is the combined speed of the two vehicles and constitutes the speed at which they move toward each other.

In this case, the patrol car upon which the radar device was mounted was moving in the opposite direction of defendant's vehicle, and the speed-detection device registered 56 miles per hour. There is neither evidence as to the speed of the highway patrol car, nor of how the speed device took that speed into consideration, or even whether it could do so. There was evidence that this was a new type of radar device which had not been in use for a very long period of time

Although, as indicated above, a radar speed-detection device using the Doppler principle is recognized scientifically, even in the absence of expert testimony with respect to its construction and method of operation, we do not feel that this principle can be extended to a device which not only measures speed but adjusts such speed measurement for the speed of the vehicle in which it is mounted. This is especially true in the absence of any evidence that the device in question can, in fact, accomplish that purpose. It is only by inference that this conclusion could be reached from the evidence herein. However, we feel that a defendant may not be convicted of speeding solely upon evidence obtained from a radar speed meter device mounted in a moving patrol car in the absence of expert testimony with respect to the construction of the device and its method of operation with respect to its ability to differentiate the speed of a vehicle approaching the moving patrol car from the opposite direction from the combined speed at which they are moving toward each other.

The only evidence that this radar system would "work while the car is moving" is the following testimony of the patrolman:

"Q. Does this radar system work while the car is moving?

"A. Yes sir, moving. Push another button, you can

check stationary. You can push another button and verify your own speed, our car with it."

There was no testimony that the patrolman ever pushed the button to verify his own speed, or of the reason for such a button. It is unclear whether the button is for the purpose of ascertaining the speed of the patrol car so that it may be deducted from the speed shown on the device, or is used merely to verify that the device is correctly registering and subtracting the speed of the patrol car from the combined speed of the vehicles. If it is the latter, the accuracy of the device in taking into account the speed of the patrol car would be an important factor. Furthermore, even assuming that the device can accomplish this, there is no indication as to whether it operates from a preset speed, or is connected to the patrol car in such a way as to measure its speed. At page 301 of the opinion in *East Cleveland, supra,* we find the following quotation:

"Professor Wigmore, in The Science of Judicial Proof, at page 450, said:

" 'since the additions made possible to our unaided senses are due to the use of instruments constructed on knowledge of scientific laws, it is plain that the correctness of the data thus obtainable must depend upon the correctness of the instrument in construction and the ability of the technical witness to use it. Hence, the following three fundamental propositions apply to testimony based on the use of all such instruments:

" 'A. *The type of apparatus purporting to be constructed on scientific principles must be accepted as dependable for the proposed purpose by the profession concerned in that branch of science or its related art.* This can be evidenced by qualified expert testimony; or, if notorious, it will be judicially noticed by the judge without evidence.

" ' B. *The particular apparatus used by the witness must be one constructed according to an accepted type and must be in good condition for accurate work.* This may be evidenced by a qualified expert.

" 'C. *The witness using the apparatus as the source of*

*his testimony must be one qualified for its use by training and experience.'*"

After noting that radar speed-detecting devices may be accepted as dependable by judicial notice in accordance with part A of the above quotation, the opinion states at page 303:

"There remains, then, only a determination as to the sufficiency of the evidence concerning the accuracy of the particular speed meter involved in the instant case and the qualifications of the person using it.

"The uncontroverted evidence introduced through the testimony of the city electrician is that the meter had been checked by the electrician on the morning of the violation; that it had been calibrated by injecting into it known frequencies checked against those transmitted by the United States Bureau of Standards radio station; that it was checked, after installation in the police car, in its actual operation by driving a police car through the beam and comparing the meter-registered speed with actual speedometer readings; and that the meter was found to be working properly in all respects.

"As has been indicated, the officer in charge of the radar car is merely required to read the dial on the meter in the same way that a speedometer is read. A police officer with five years of experience is certainly qualified to do that."

In this case, the patrolman was both the "qualified expert" testifying that the particular radar device used was "an acceptable type" and was "in good condition for accurate work" as well as being the one using the device. His qualifications in the record consist of an indication that he has been a highway patrolman for six and a half years. His testimony as to the accuracy of the device consisted of the following:

"Q. And, Officer, does this radar have any type of calibration to it? How do you calibrate it?

"A. Yes, sir. We have two tuning forks, and there's another button where you tune it. And you turn the dial and the calibration comes up as 64 on the digital dial, and then you clear that. You set that on your stationary button.

You have two tuning forks, one for 35 and one for 65, and you tune it with each of the tuning forks and then you push in the moving button. You get both of these tuning forks going and hold them up opposite each other, and it will indicate 30 miles per hour on your box. It's opposite each other, so it was actually calibrated four ways on that one.

"Q. And did you do the calibration?

"A. Yes, sir."

The evidence herein falls far short of being substantially equivalent to the evidence that was approved in *East Cleveland* as being sufficient to establish the accuracy of the particular speed meter involved and the qualifications of the person using it.

We, accordingly, find that the judgment is against the manifest weight of the evidence in that there was insufficient evidence concerning the accuracy of the particular speed meter involved in the instant case, and the qualifications of the person checking, calibrating and using it to support a conviction for speeding solely upon the basis of a reading obtained from such device. Accordingly, the first assignment of error is well taken.

The second assignment of error relates to the interruption by the trial court of final argument on behalf of defendant, wherein counsel was arguing that there was no reason for the patrolman to have changed the speed selector after obtaining a reading of the speed of defendant, the court interrupting to state: "I know why they do that." This is obviously error because the court is giving the impression that he is predicating his opinion upon this point upon evidence not before him and of which he could not properly take judicial notice. However, we do not find it to be prejudicial. The patrolman testified that he changed the speed selector, but did not change the speed registered for defendant's vehicle. In other words, the patrolman testified that the speed indication of 56 miles per hour, purporting to represent defendant's speed, remained on the device at all times until after defendant was stopped by the patrolman.

The changing of the speed selector from 45 to 60 would only serve to cast doubt upon the testimony of the patrol-

man that he obtained the speed reading of 56 miles per hour prior to defendant's entering I-270. In other words, the changing of the selector to a speed higher than that indicated as being the speed of the apprehended vehicle, where the vehicle is apprehended on a highway where such speed is *prima facie* lawful, would tend to indicate that the reading was obtained upon such highway rather than at an earlier point where a lower *prima facie* speed limit exists. However, in the final analysis, it is up to the trier of the facts to determine whether or not he believes the testi-mony of the police officer. Under the circumstances herein, we cannot find the statement by the trial court in interrupt-ing final argument by counsel for defendant to be prejudi-cial. The second assignment of error is overruled.

For the foregoing reasons, the first assignment of er-ror is sustained, and the second assignment of error is overruled, and the judgment of the Franklin County Muni-cipal Court is reversed, and this cause is remanded to that court for further proceedings in accordance with law con-sistent with this decision.

*Judgment reversed and cause remanded.*

STRAUSBAUGH and HOLMES, JJ., concur.

HOLMES, J., concurring. I join in the majority herein, inasmuch as I feel that certain definite legally acceptable procedural standards must be established for the utilization of a new testing device or equipment, the product of which is to be offered as evidence in a judicial proceeding.

Once the nature of the device or equipment has been explained through expert testimony and the acceptable procedural techniques in the use thereof established, such may thereafter, if properly shown, be appropriately judi-cially recognized as a proper device or item of equipment for such testing purpose, and the procedural practices, as shown to be conducted in later case situations, evaluated.