VILLAGE OF PEMBERVILLE *v.* DIETRICH.

(No. 83-TRD-2128—Decided July 26, 1983.)

Bowling Green Municipal Court.

*Mr. Jerry W. Lee,* village prosecutor, for plaintiff.
*Mr. George Royer,* for defendant.

BACHMAN, J.

### Introduction

This case involves a traffic charge against the defendant, Frank Dietrich, where the complainant alleges in his traffic ticket that on April 5, 1983, at 2:14 a.m., the defendant operated a vehicle at a speed unreasonable for conditions, namely, forty-two m.p.h. in a twenty-five m.p.h. zone, contrary to Pemberville Ordinance Section 73.10.

### Uncontested Issues: Findings of Fact

The court finds from the evidence, and it is not seriously controverted, that beyond a reasonable doubt:

1. On April 5, 1983, at 2:14 a.m., the defendant, Frank Dietrich ("Dietrich"), was operating a vehicle, namely, 1979 four-door Chevrolet, moving eastbound upon a public street, namely, East Front Street, near Memorial Drive, in the village of Pemberville, Wood County, Ohio;

2. At that time, the complainant, D. K. O'Connor ("O'Connor"), a law enforcement officer for the village of Pemberville, was on duty, and was operating a patrol car moving at about twenty-five m.p.h. westbound on Front Street. He was in a uniform prescribed by the village of Pemberville. His patrol vehicle had the village of Pemberville emblems on the side and a visibar light on top;

3. O'Connor was using an MPH model S-80 radar to detect the speed of moving vehicles, including Dietrich's vehicle;

4. It was nighttime and the visibility was clear for at least six hundred feet. There was no other traffic in the vicinity. At the spot where Dietrich's vehicle was radar checked by O'Connor, the roadway was one lane on Dietrich's side and one and one-half lanes on the opposite side. There was a guardrail along the right edge on Dietrich's side of the roadway; and

5. At the time and place pertinent herein, the prima facie speed limit was twenty-five m.p.h., the area being a business district.

### Contested Issues

The real contested issue here is the speed of Dietrich's moving vehicle at the date, time, and place alleged in the complaint. More specifically, the issue is whether the S-80 radar is a reliable device for determining the speed of a vehicle moving on the roadway, and whether at the time of this incident the radar was in proper working order and was being used by a qualified operator. Below, the court has made findings of fact and conclusions of law.

### Radar Operator's Qualifications

The court finds from the evidence beyond a reasonable doubt that

O'Connor's qualifications as a radar operator are:

He is a police officer, presently with the village of Pemberville for two years, and previously with the village of Wayne for one year;

He has an undisclosed number of hours of classroom training on how to use the K-55 radar, and has one year of on-the-job training in the actual use of the K-55 radar;

At some time in 1982 during a two-week period (for an undisclosed number of hours), he monitored the use of the S-80 radar while — the court infers — it was being operated by a trained radar operator;

On June 9, 1982, he successfully completed one-day (four to six hours) of classroom and on-the-road instruction, plus oral and written tests, in the use of the S-80 radar, conducted by a manufacturer's representative at the Findlay Police Department; and

On June 24, 1982, he successfully completed a similar experience at the Pemberville Police Department.

As to O'Connor's experience in using the S-80 radar, from June 1982 to the date of the citation, he used the S-80 radar continually while on duty. During that time, he made several hundred speed readings each shift, or over one thousand readings per week, or nearly fifty thousand readings for that ten-month period. (A Mr. Sargeant, the patent holder of the S-80 radar and an officer in the company which manufactures it, was of the opinion that O'Connor was qualified to use that radar.)

From all of the above, the court concludes beyond a reasonable doubt that O'Connor, by training and experience, was qualified to use the S-80 radar. See *State* v. *Shelt* (1976), 46 Ohio App. 2d 115 [75 O.O.2d 103]; *State* v. *Wilcox* (1974), 40 Ohio App. 2d 380 [69 O.O.2d 333].

### Radar's Working Order

The court finds from the evidence beyond a reasonable doubt that three times on the date of this incident, at the beginning of O'Connor's shift, once during it, and at the end of it, he checked the calibration of the S-80 radar. That procedure included:

1. The light check, where the officer pressed a button, and all the lighting elements lighted up. This indicated that all of them were functional and not burned out;

2. The internal check, where the officer pressed a button, and the radar unit's readout was "32." This indicated that the radar's internal functions were operational;

3. The tuning fork check, where the officer struck a thirty-five m.p.h. tuning fork, and then an eighty m.p.h. tuning fork, and the radar unit's readout was, respectively, "35" and "80." This indicated that the radar's internal functions were operational; and

4. The SOS adapter check, where the officer flipped on a switch while the patrol car was moving down the street. In this test, the radar compared two readouts for the speed of the moving patrol car: the first speed, obtained directly from the transmission; and, the second speed, obtained by the radar's beam directed onto the roadway. The two speeds should have the same readout if the radar is working properly. When the officer performed the SOS adapter check, the two speeds did have the same readout, and he concluded that the radar was operating properly.

Thus, O'Connor found each time that each calibration result was what it should be, and he concluded from those results that the radar was in proper working order. The procedure followed by O'Connor was in accordance with the radar manufacturer's instructions.

Therefore, the court concludes beyond a reasonable doubt that at the time of this incident the S-80 radar was in good condition for accurate use. See *State* v. *Shelt* and *State* v. *Wilcox, supra.*

### Radar's Reliability

Is an S-80 radar mounted in a moving patrol car a reliable device to determine accurately the speed of a target vehicle moving toward the patrol car? From evidence beyond a reasonable doubt, the court concludes that it is. More specifically, does the S-80 radar have the ability to differentiate correctly between the target vehicle's speed and the two vehicles' combined speeds as they approach each other from opposite directions? From evidence beyond a reasonable doubt, the court concludes that is does.

Sargeant gave more than adequate scientific testimony to support the court's two conclusions above. This is so despite the fact that Sargeant has an interest in the S-80 radar. The court determines that in this case he is a credible witness and his testimony is entitled to great weight.

Secondly, the S-80 radar, according to Sargeant, operates on the Doppler principle, in a fashion similar to K-55 radar. Other courts have found the K-55 radar (as well as the MR-7 radar, that was developed before it) to be a scientifically reliable device for measuring the speeds of moving vehicles. See *Akron* v. *Gray* (1979), 60 Ohio Misc. 68 [14 O.O.3d 303], and the cases cited therein: *State* v. *McCoy* (January 11, 1979), New Philadelphia M.C. No. 78 TRD 6752, unreported, and *State* v. *Shelt, supra* (by the Court of Appeals for Lucas County). See, also, *State* v. *Ford* (November 28, 1980), Wood App. No. WD-80-18, unreported, and *State* v. *Van Gunten* (June 12, 1981), Fulton App. No. F-80-16, unreported. In *Ford* the K-55 radar was being operated in the moving mode, as opposed to the stationary mode. In *Van Gunten* it is unclear in which mode it was being operated.

Thirdly, not only did Sargeant testify that the S-80 radar — in either the stationary mode or the moving mode — has exactly the same principles of operation as those of the K-55 radar, he also testified that it has several improved features over those of the K-55 radar. These are:

1. The S-80 radar employs a separate readout window, the "target lock window" (in addition to the "target window" which is not locked), so that the officer may continue to monitor the target vehicle's speed after he has locked in the vehicle's speed. This helps the officer in heavier traffic situations, to assure that the vehicle he locked in was indeed the vehicle he saw. (He can watch it slow down, or speed up, or whatever.);

2. The S-80 radar employs a filtering system to make it more adaptable to either a city situation or an open highway system, by using either a "city" switch or a "country" switch on the radar. In the city, it can read very slow patrol car speeds down to seven or eight m.p.h. and very slow target speeds down to nineteen to twenty m.p.h. or less;

3. The S-80 radar employs several different circuits to safeguard it from outside influences (so-called "anomalies" or "ghosting"), namely:

(a) A spurious radio (RFI) detector, to shut down the radar and turn on a light if spurious radio signals (ranging from .550 kilocycles in the broadcast band up to the microwave frequencies — including CB frequencies — around .27 megacycles) are interfering with the radar;

(b) A coherence detector, to shut down the radar and turn on a light if second and third harmonics of the transmitted signal are interfering with the radar;

(c) A low voltage detector, to shut down the radar and turn on a light if low voltage in the patrol car is interfering with the radar;

(d) An overload detector, to shut down the radar and turn on a light if the radar is swamped by very heavy return signals (such as in an underpass or bridge), which interfere with the radar;

4. In the moving mode, the S-80 radar has two separate filter channels (two simple radars). The radar scans the

ground, and from that determines the patrol car's speed. It also scans the target vehicle, and from that determines that vehicle's speed; and

5. Also, the S-80 radar is capable of having a device connected to it, which supersedes the radar's ability to detect the patrol car's speed by scanning the ground, and which allows it to get a reading of that speed directly from the module on the speedometer by taking a direct drive from the speedometer.

In either the moving mode or the stationary mode, the S-80 radar can determine the speed of the target vehicle within plus or minus one m.p.h. It does not have an automatic lock for the moving mode.

Secondly, the S-80 radar overcomes the propensity of some of the older radars — prior, the court infers, to the K-55 radar — to read a radio station or CB transmitter nearby, when the radar would be pointed at a billboard or palm tree, and its beam reflected to the transmitter, thereby triggering it. (For those older radars, the officer was trained to interpret the radar's peculiar audio tone, and disregard the reading under those circumstances.) Furthermore, the S-80's automatic gain control will disregard the weak signal of such an anomaly (for example, the patrol car's air conditioner or defroster fan, or a car moving on a side street) when the radar detects a center beam target (*i.e.*, the target vehicle). In other words, the strong center beam signal will immediately displace these other weak signals.

In addition, if the patrol car accelerates or decelerates more than three to four m.p.h./second, the S-80 radar will blank out the patrol speed readout. Without that readout, the radar will not read the target speed. Likewise, if the target vehicle accelerates or decelerates more than three to four m.p.h./second, the S-80 radar will blank out the target speed readout. And, without that readout, the radar will not read the target speed.

For either of these to result, there must be very heavy acceleration or hard braking. The results are not caused by steady acceleration. The results, also, are not caused by a letting up on the gas; they require braking.

From the expert testimony in this case with respect to the construction of the MPH model S-80 radar and its method of operation, and the case law, the court concludes beyond a reasonable doubt that the MPH model S-80 radar while mounted in a moving patrol car is a reliable device for accurately determining the speed of a target vehicle moving toward the patrol car, and, specifically, that it has the ability to differentiate correctly between the target vehicle's speed and the two vehicles' combined speeds as they approach each other from opposite directions.

## Radar Operator's Determination of the Moving Vehicle's Speed

The court finds from the evidence beyond a reasonable doubt that just before O'Connor made a radar check of the Dietrich vehicle, the radar unit was on, but it was in a standby mode. Then, when O'Connor saw the Dietrich vehicle he switched the radar to "run," saw a readout of "42" in the radar's target window, heard a solid audio tone coming from the radar unit, concluded that the visual reading and audio tone were for the approaching Dietrich vehicle, and locked in the radar. O'Connor turned his patrol car, pursued and stopped that vehicle without losing sight of it, and determined that its operator was Dietrich.

The court concludes beyond a reasonable doubt that O'Connor properly read the radar unit. This reading included:

(1) his visual identification of the target vehicle (*i.e.*, Dietrich's);

(2) his visual determination that the radar readout of "42" was for the speed of that moving vehicle; and

(3) his audio determination that the

radar's tone indicated that the radar was detecting the presence of that moving vehicle.

### Reasonableness of Speed as Related to the Conditions

Based upon the evidence beyond a reasonable doubt, including that stated in the findings of fact throughout this decision, the court concludes beyond a reasonable doubt that the speed of Dietrich's vehicle was unreasonable for the conditions existing at the time of this incident.

### Ultimate Conclusion

The court concludes beyond a reasonable doubt that the defendant, Dietrich, is guilty as charged.

*Defendant guilty.*