[Cite as *Cleveland v. Craig*, 2013-Ohio-5742.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99619**

# CITY OF CLEVELAND

PLAINTIFF-APPELLEE

vs.

# SHERRI S. CRAIG

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cleveland Municipal Court
Case No. 2012 TRD 074198

**BEFORE:** S. Gallagher, J., Stewart, A.J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:** December 26, 2013

**ATTORNEY FOR APPELLANT**

Steve W. Canfil
1370 Ontario Street
Standard Building
Suite 2000
Cleveland, Ohio   44113-1701


**ATTORNEYS FOR APPELLEE**

Barbara A. Langhenry
Director of Law

By: Victor R. Perez
Chief City Prosecutor
Angela Rodriguez
Assistant City Prosecutor
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio    44113

SEAN C. GALLAGHER, J.:

{¶1} Appellant Sherri Craig appeals from a conviction for speeding. For the reasons stated herein, we affirm.

{¶2} On December 20, 2012, appellant was charged with speeding in violation of Cleveland Codified Ordinances 433.03, a third-degree misdemeanor. Appellant entered a plea of not guilty, and the case proceeded to trial.

{¶3} At trial, Cleveland Police Officer Cesar Herrera testified that on December 20, 2012, he pulled appellant over for speeding in a school zone on Warren Road. The speed limit on Warren Road is normally 35 m.p.h., but is reduced to 20 m.p.h. in school zones during certain hours.

{¶4} Officer Herrera was parked stationary near the intersection of Warren Road and Montrose Avenue in front of a school zone's flashing lights. He watched oncoming traffic in the school zone, which is approximately two blocks. He observed appellant's 2006 Chevy Impala moving faster than the flow of traffic. He estimated the speed to be about 30–32 m.p.h., and he heard a sound from his radar unit. His radar unit showed the vehicle was traveling 32 m.p.h. Officer Herrera pulled the vehicle over. No objection was raised as to the radar unit's reading.

{¶5} Officer Herrera had a Genesis II radar unit in his vehicle. He testified that he had been employed with the police department for 21 years, that he had been trained on the particular radar unit, and that he had a certification that was current. He further stated that he calibrated the radar unit every day before and after his shift with the calibration

forks that came with the unit, and that the unit was working properly when he started and ended his shift on December 20, 2012.

**{¶6}** No objection was raised as to the officer's qualifications and certification. He indicated on cross-examination that he was certified between July and September 2012, but he did not have his certification with him. He also did not have the calibration record for the radar unit with him.

**{¶7}** Officer Herrera testified that he ran appellant's license plate to obtain her driving record from the Law Enforcement Automated Data System ("LEADS") and that he is LEADS certified. The trial court overruled defense counsel's objection to the officer's testimony concerning the information the officer learned. The city submitted a certified copy of the LEADS report. The LEADS report contained appellant's driving record from the Bureau of Motor Vehicles and showed two prior moving violations within the last 12 months. Officer Herrera issued appellant a citation for speeding and marked it as a third-degree misdemeanor.

**{¶8}** Appellant testified that she knew the speed limit to be 35 m.p.h. and she heard the officer say the posted speed limit is 35 m.p.h. She denied knowledge of speeding. On cross-examination, she stated she was going "about 20, 20 something" and to her knowledge she was not speeding.

**{¶9}** The trial court found appellant guilty of the offense of speeding as a third-degree misdemeanor. The court imposed a $200 fine plus costs.

{¶10} Appellant timely filed this appeal. She raises two assignments of error for our review. Under her first assignment of error, appellant claims the trial court committed plain error when it permitted the police officer to testify regarding appellant's speed and by basing its finding of guilt on that testimony. Appellant asserts the trial court did not take judicial notice of the accuracy and reliability of the Genesis II radar unit and that there was no legitimate basis to establish the scientific reliability of the device. Because appellant claims that the radar reading was improperly admitted, she asserts that the officer's visual estimation of speed was insufficient to convict appellant on the speeding charge.

{¶11} Before examining the specific issues in this case, a general review of some of the history of speed measuring devices and the admissibility of their results is in order.

> It is common and general knowledge that radar was developed in England in the late 1930's. In its most elementary conception, it consists of a microwave transmitter sending out a directional signal which is reflected back to the transmission site by an object in its path. The reflected signal is received back by an antenna into a receiving unit in the radar, and basically the time between transmission and reception is measured electronically. Based upon the known speed of the signal, the time and speed factors provide the basis for an exact calculation of the distance between the radar and the reflecting object.
>
> Radar has developed many uses since its introduction in the 1930's, not the least of which is the highly simple, precise and accurate radar device for measuring the speed of a moving vehicle.

*People v. MacLaird*, 264 Cal.App.2d 972, 973, 71 Cal.Rptr. 191 (1968).

{¶12} Invention of the radar speed gun has been credited to John L. Barker Sr., who developed radar for the military during World War II. After the war, Barker tested radar on vehicles in Connecticut. *See* Pagan Kennedy, *Innovation: Who Made That Traffic*

*Radar?*, The New York Times (Aug. 30, 2013). The Automatic Signal Company built one of the first traffic radars in 1947 for the Connecticut state police. These radars operated only from a stationary position and measured receding as well as approaching targets to an accuracy of about ± 2 m.p.h. Donald S. Sawicki, *Traffic Radar Handbook: A Comprehensive Guide to Speed Measuring Systems* (2002).

{¶13} As use of radar methods in detecting the presence of objects and their distance and speed became widespread, the general accuracy and effectiveness of the radar speedmeter was no longer questioned and became a commonly known and accepted proposition. *MacLaird* at 974-975. As a result, courts began to take judicial notice of the general reliability of the radar speedmeter as a device for measuring the speed of a moving vehicle and found no need for expert testimony as to the scientific principles underlying radar devices. *Id.*

> "The writings on the subject assert that when properly operated they accurately record speed (within reasonable tolerances of perhaps two or three miles per hour) and * * * it would seem that evidence of radar speedmeter readings should be received in evidence upon a showing that the speedmeter was properly set up and tested by the police officers without any need for independent expert testimony by electrical engineers as to its general nature and trustworthiness."

*MacLaird* at 974, quoting *State v. Dantonio*, 18 N.J. 570, 578, 115 A.2d 35 (1955).

{¶14} Ohio and other jurisdictions followed the practical recognition that the scientific principles of radar can and should be judicially noticed. *MacLaird* at 974. More than 50 years ago, the Ohio Supreme Court confirmed that the reliability of the scientific principles underlying the use of stationary radar could be established without the

need for expert testimony. *E. Cleveland v. Ferell*, 168 Ohio St. 298, 154 N.E.2d 630 (1958), syllabus. *See also Cleveland v. Tisdale*, 8th Dist. Cuyahoga No. 89877, 2008-Ohio-2807; *State v. Everett*, 3d Dist. Wyandot No. 16-09-10, 2009-Ohio-6714.

{¶15} In *Ferell*, the Ohio Supreme Court did not focus on the specific speed measuring device at issue because all devices in use at that time were stationary models using the "S" band frequency. Subsequent improvements to radar devices would see the introduction of models using different frequencies. These included the "X" band in 1965, the "K" band in 1976, and the "Ka" band in 1983. Some of these later models could be operated in either the stationary or moving mode. *See generally* Donald S. Sawicki, *Police Radar Handbook: A Comprehensive Guide to Speed Measuring Systems* (2013).

{¶16} The evolution of such devices allowing for moving radar changed the rules for admissibility of results from speed measuring devices. We discussed this transformation in *Tisdale*:

> As the standard has evolved, Ohio courts hold that where a moving radar device is involved, expert testimony or judicial notice of the construction and accuracy of moving radar devices is required to sustain a conviction based on a reading from such device. *Mentor v. Becka* (Jan. 12, 1990), Lake App. No. 88-L-13-146, 1990 Ohio App. LEXIS 62. As stated in [*State v.*]*Wilcox*, 40 Ohio App.2d 380, 319 N.E.2d 615 [(1974)], at paragraph two of the syllabus: "A person may not be convicted of speeding solely upon evidence obtained from a radar speed-meter device mounted in a moving patrol car in the absence of (1) expert testimony with respect to construction of the device and its method of operation with respect to its ability to differentiate the speed of a vehicle approaching the moving patrol car from the opposite direction from the combined speed at which the two vehicles are moving toward each other, and (2) evidence that the device is in good condition for accurate work, and (3) evidence that the witness using the device is one qualified for its use by training and experience." See, also, *State v. Bayus*, Geauga App. No. 2005-G-2634, 2006 Ohio 1684. On the first

prong, once a trial court has heard expert testimony on the issue, it may take judicial notice of the radar's reliability in subsequent cases. *State v. Kirkland* (Mar. 2, 1998), Logan App. No. 8-97-22, 1998 Ohio App. LEXIS 1100.

Where judicial notice is applicable, the method of proof involves establishing the reliability of a speed-measuring device by (1) a reported municipal court decision; (2) a reported or unreported case from an appellate court; or (3) the previous consideration of expert testimony about a specific device where a trial court notes it on the record. *Cincinnati v. Levine*, 158 Ohio App.3d 657, 2004 Ohio 5992, 821 N.E.2d 613.

*Tisdale* at ¶ 13-14.

{¶17} In *Tisdale*, we went on to question the need to "re-prove" the science behind speed measuring devices in every case where an expert did not testify or judicial notice could not be taken. We felt a compelling argument could be made that "all radar-based speed measuring devices in use today, and arguably all laser-based units now in use, are reliable, even in the absence of expert testimony as to their reliability." *Tisdale*, 8th Dist. Cuyahoga No. 89877, 2008-Ohio-2807, at ¶ 15.

There is a compelling view that the same trust and reliability the Ohio Supreme Court placed in stationary radar devices in *Ferell* should now, 50 years later, be extended to other speed measuring devices that have arguably withstood the test of time. Authority from other states supports the view that the principles of *Ferell* should be extended to other radar and laser speed measuring devices that have stood the test of time in terms of their scientific reliability.

*Id.*

{¶18} *Tisdale* stood for the view that the focus should be on the accuracy of the particular speed meter involved as established by proper calibration and the training and qualifications of the person using it, rather than the science behind it. Nevertheless, while *Tisdale* was cited for its changed approach in some opinions and one lengthy dissenting

opinion, *see Garfield Hts. v. Pease*, 8th Dist. Cuyahoga No. 95904, 2011-Ohio-1379; *Shaker Hts. v. Sevayega*, 8th Dist. Cuyahoga No. 98780, 2013-Ohio-589; *State v. Freiteg*, 9th Dist. Wayne No. 07CA0082, 2008-Ohio-6573 (Whitmore, J., dissenting), it was also criticized for its move away from the traditional method of establishing admissibility of speed measuring device results. *See State v. Zhovner*, 2013-Ohio-749, 987 N.E.2d 333 (3d Dist.); *Beachwood v. Joyner*, 2012-Ohio-5884, 984 N.E.2d 388 (8th Dist.).

{¶19} In any event, virtually all the cases following *Ferell* acknowledged the distinction between the use of stationary radar and moving radar or laser devices. The question today is, how should we apply the principle in *Ferell*, over 55 years later, in a changed landscape littered with new technology?

{¶20} Was the court in *Ferell* taking judicial notice only of the underlying principles of radar as an electronic device that scientifically and accurately measures the speed of a moving object? Or were they only judicially noticing the accuracy and operating efficiency of the particular radar device used to measure the speed of Ferell's vehicle in that case before the court? As noted earlier, the specific device at play in *Ferell* was not identified, suggesting the court was giving its tacit blessing to all stationary radar devices. What was not addressed, and what was unknown to the justices at the time, was how the technology would evolve and improve with the introduction of new, more advanced measuring instruments.

{¶21} Judge Whitmore's dissent in *Freiteg* outlined the problem of focusing on specific devices.

Ohio courts have continued to require expert testimony on a device-specific basis as technology has changed over time to include moving and laser-based devices. See, e.g., *State v. Saphire* (Dec. 8, 2000), 2d Dist. No. 2000 CA 39, 2000 Ohio App. LEXIS 5767 (addressing what appeared to be the Ultralite 20/20 Model 200 laser); *State v. Kirkland* (Mar. 2, 1998), 3d Dist. No. 8-97-22, 1998 Ohio App. LEXIS 1100 (addressing the K-55 radar-moving mode); *State v. Schroeder* (Sept. 8, 1995), 11th Dist. No. 95-G-1907, 1995 Ohio App. LEXIS 3910 (addressing the LTI 20/20 laser); *Moreland Hills v. Gazdak* (1988), 49 Ohio App.3d 22, 550 N.E.2d 203 (addressing the Model S-80 moving radar). This movement, however, has evolved into a device- and jurisdiction-specific inquiry, and has returned us to a *pre-Ferell* state of "[wasting] the time of experts *** and [increasing] the expenses of litigation *** by compelling such [experts] to appear in court after court telling the  same truths over and over[.]" *Ferell*, 168 Ohio St. at 302, quoting *State v. Dantonio* (1955), 18 N.J. 570, 579, 115 A.2d 35.

*Freiteg*, 9th Dist. Wayne No. 07CA0082, 2008-Ohio-6573, at ¶ 25 (Whitmore, J., dissenting).

**{¶22}** While *Ferell* has been viewed as an outdated opinion by some, we view the rationale concerning the general acceptance of the scientific reliability of radar as a device for measuring speed should continue to be applied to stationary radar devices in use today. Unless and until the Ohio Supreme Court states otherwise, at least insofar as stationary devices are concerned, we shall continue to adhere to *Ferell*'s holding that "readings of a radar speed meter may be accepted in evidence * * * without the necessity of offering expert testimony as to the scientific principles underlying them." *Ferell*, 168 Ohio St. at 303, 154 N.E.2d 630. Further, in light of the increasing debate among appellate courts, we would encourage the Ohio Supreme Court to consider whether expert testimony should be required to establish the general reliability of moving-radar and laser speed devices. Arguably, both radar and laser technology are now commonly accepted and recognized

methods for reliably and accurately measuring the speed of a moving vehicle. The need to revisit the issue of judicial notice is compelling.

{¶23} Speed measuring devices are not the only technology creating issues in traffic enforcement. We are seeing an analogous debate over the admissibility of breath test results from the controversial Intoxilyzer 8000 in OVI cases. A comparison of the two issues gives some perspective. Contrary to speed cases where without judicial notice the state must prove the science behind the device in each case, in OVI cases the defendant is precluded from making a general attack on the reliability of the science behind breath testing devices. *See generally State v. Vega*, 12 Ohio St.3d 185, 465 N.E.2d 1303 (1984); *State v. Johnson*, 11th Dist. Portage No. 2012-P-0008, 2013-Ohio-440; *State v. Bergman*, 11th Dist. Portage No. 2012-P-0124, 2013-Ohio-3073; *State v. Dugan*, 12th Dist. Butler No. CA2012-04-081, 2013-Ohio-447.[1]

{¶24} This distinction is grounded in the fact that the Ohio Department of Public Health approves breath testing devices in Ohio, but the Ohio Department of Public Safety has no similar code section to approve speed measuring devices. *See* Ohio Adm.Code

---

[1] There is considerable debate over the admissibility of breath testing results from the Intoxilyzer 8000. Some premise admissibility on the inherent constitutional power of the trial judge to admit evidence with the presumption of general reliability based on the legislative approval of the 8000 in Ohio Adm.Code 3701-53-02. Others construe the legislative approval to require admission, while still others consider admissibility based on the language in R.C. 4511.19(D)(1)(b) and a determination of reliability based on the principles outlined in *Daubert*. *State v. Johnson*, 11th Dist. Portage No. 2012-P-0008, 2013-Ohio-440, and *State v. Gerome*, Athens M.C. Nos. 11TRC01909, 11TRC00826, 11TRC01734, and 11TRC02434 (June 29, 2011). *See also* Judge William Grim, *Intoxilyzer 8000 Case Update*, Ohio Judicial College (Nov. 15, 2013).

3701-53-02 (Breath Tests). This is an inherent problem in the approach taken by Ohio. If Ohio tested and approved speed measuring devices, the units could attain at least a tacit presumption of admissibility subject to confrontation at trial regarding their accuracy.

**{¶25}** The debate over admissibility does not end with the devices themselves. *Tisdale* also took issue with how judicial notice was employed: "We question the practical limitations of judicial notice being limited to the territorial jurisdiction of the court and believe the Ohio Supreme Court may wish to re-examine the standard in terms of cross-jurisdictional judicial notice." *Tisdale*, 8th Dist. Cuyahoga No. 89877, 2008-Ohio-2807, at ¶ 14.

**{¶26}** A similar refrain was heard in Judge Whitmore's dissent in *Freiteg*, where she raised concerns about how opinions are now reported and characterized in Ohio. *Freiteg*, 9th Dist. Wayne No. 07CA0082, 2008-Ohio-6573, at ¶ 22-23 (Whitmore, J., dissenting).

> The reporting distinctions outlined in [*State v. Miko*, 9th Dist. Medina No. 07CA0018-M, 2008-Ohio-1991] and adopted by our Court no longer comport with the revised reporting rules enacted by the Supreme Court in 2002 which effectively abolished the distinction between "reported" and "unreported" appellate court opinions. See Rep.R. 4. Nor do they align with the Supreme Court's current requirements for the reporting of trial court opinions. See Rep.R. 5. Thus, I consider the requirement born from case law that judicial notice of speed radar devices may only be taken in a case where the device's scientific accuracy is reported in a published trial court decision or a published or unpublished appellate court decision to be inconsistent with Supreme Court's revised rules governing opinion reporting.

*Id*. at ¶ 22.

**{¶27}** Judge Whitmore's comments point out the deficiency in Evid.R. 201 where the technology of the Internet has outpaced the language of that rule. The long road from *Ferell* to our case today points out the impact that changing technologies have on the admissibility of evidence.

**{¶28}** Turning to our case, we first note that by failing to object to Officer Herrera's testimony regarding the radar reading at trial, appellant forfeited her right to challenge the admission of that testimony on appeal, limiting our review to plain error. Evid.R. 103(A)(1); *State v. Tibbetts*, 92 Ohio St.3d 146, 161, 749 N.E.2d 226 (2001). We find no basis for plain error.

**{¶29}** It is undisputed that Officer Herrera's vehicle was stationary when the radar clocked appellant's vehicle traveling at a speed of 32 m.p.h. This reading was properly accepted in evidence without the need for expert testimony. *See Ferell*, 168 Ohio St. at 303, 154 N.E.2d 630; *Sevayega*, 8th Dist. Cuyahoga No. 98780, 2013-Ohio-589, at ¶ 15.

**{¶30}** Additionally, the evidence established that the officer had been with the police department for 21 years, that the radar unit was checked by the officer before and after his shift with the calibration forks provided for the unit, that the officer was certified to use the unit and his certification was current, and that the unit was found to be working properly. Without objection, this testimony was sufficient to establish the radar unit was accurate and in working order and that the officer was qualified to use it. *See Sevayega* at ¶ 22. Further, we do not find documentary evidence was required to establish the officer's qualifications.

**{¶31}** Finally, while appellant correctly asserts that an officer's unaided visual estimation of speed could not form the basis for his conviction, *see* R.C. 4511.091(C), in

this case, the officer testified that the stationary radar verified his observation. As a stationary radar unit was involved, expert testimony was not required. *See Ferell* at 303; *Sevayaga* at ¶ 15.

{¶32} Accordingly, we are unable to find that the trial court erred with regard to Officer Herrera's testimony. Appellant's first assignment of error is overruled.

{¶33} Under her second assignment of error, appellant argues the trial court erred by admitting the LEADS printout.

{¶34} R.C. 2945.75(B)(2) provides:

(2) Whenever in any case it is necessary to prove a prior conviction of an offense for which the registrar of motor vehicles maintains a record, a certified copy of the record that shows the name, date of birth, and social security number of the accused is prima-facie evidence of the identity of the accused and prima-facie evidence of all prior convictions shown on the record. * * *.

{¶35} R.C. 4501.34 states in pertinent part:

[A]ll documents in the registrar's possession are public records. The registrar shall adopt a seal bearing the inscription: "Motor Vehicle Registrar of Ohio." The seal shall be affixed to all writs and authenticated copies of records, and, when it has been so attached, the copies shall be received in evidence with the same effect as other public records. All courts shall take judicial notice of the seal.

{¶36} In this case, the City introduced a record request certification letter from the Ohio Bureau of Motor Vehicles Registrar ("Ohio BMV"). The letter was signed by an Ohio BMV official, had an embossed seal bearing the inscription "Motor Vehicles

Registrar of Ohio," and had an attachment of appellant's driving record with the required identity information. Properly signed and sealed Ohio BMV records are self-authenticating under Evid.R. 902. *State v. Davis*, 6th Dist. Sandusky No. S-04-026, 2005-Ohio-4877, ¶ 13; *State v. Harper*, 10th Dist. Franklin Nos. 00AP-23, 00AP-24, 00AP-25, 00AP-26, and 00AP-27, 2000 Ohio App. LEXIS 6015, *15 (Dec. 21, 2000). The fact that the trial court did not expressly state it was taking judicial notice of the seal was harmless.

{¶37} Additionally, this court has repeatedly found that a LEADS printout is admissible as a public record under Evid.R. 803(8)(a). *Cleveland Metro. Park Dist. v. Schillinger*, 8th Dist. Cuyahoga No. 71512, 1997 Ohio App. LEXIS 3998, *3 (Sept. 4, 1997); *State v. Cooper*, 8th Dist. Cuyahoga No. 43765, 1982 Ohio App. LEXIS 11330 (Mar. 18, 1982). Further, a LEADS report may be identified and authenticated through testimony from an officer who viewed the report. *Middleburg Hts. v. D'Ettorre*, 138 Ohio App.3d 700, 708, 742 N.E.2d 196 (8th Dist.2000); *Schillinger* at *4. The record herein reflects that Officer Herrera's testimony was sufficient to authenticate the report.

{¶38} Appellant's second assignment of error is overruled.

{¶39} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the municipal court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the

Rules of Appellate Procedure.


SEAN C. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, J., CONCURS;
MELODY J. STEWART, A.J., CONCURS IN JUDGMENT ONLY