[Cite as *State v. Helke*, 2015-Ohio-4402.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 26672 |
| | : | |
| v. | : | Trial Court Case No. 2015-TRD-2656 |
| | : | |
| MICHAEL HELKE | : | (Criminal Appeal from |
| | : | Municipal Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of October, 2015.

. . . . . . . . . .

KENT J. DEPOORTER, Atty. Reg. No. 0058487, City Prosecutor, 7501 Paragon Road, Dayton, Ohio 45459
        Attorney for Plaintiff-Appellee

MICHAEL HELKE, 214 Drake Avenue, New Carlisle, Ohio 45344
        Defendant-Appellant-Pro Se

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this case, Defendant-Appellant, Michael Helke, appeals pro se from a judgment of the Kettering Municipal Court convicting him of speeding in violation of R.C. 4511.21(D)(1). After a bench trial, the court found Helke guilty and imposed a $150 fine plus costs, with $75 of the fine suspended.

{¶ 2} Helke contends that the trial court erred by accepting testimony about an officer's visual estimate of speed and the operation of a laser speed detector. Helke further contends that the State failed to lay a proper foundation that the laser device was in good working condition, was calibrated properly, and was scientifically reliable. He also argues that the trial court could not take judicial notice of the laser device's scientific reliability. Helke, therefore, contends that the conviction is not supported by sufficient evidence.

{¶ 3} We conclude that the State failed to provide a proper foundation for the scientific reliability of the laser device, and the trial court failed to take judicial notice of reliability pursuant to recognized methods for doing so. As a result, there was insufficient evidence to support Helke's conviction. Accordingly, the judgment of the trial court will be reversed.


I. Facts and Course of Proceedings

{¶ 4} In April 2015, a complaint was filed against Helke in Kettering Municipal Court, charging him with driving 83 miles per hour in a 55 mile per hour zone, in violation of R.C. 4511.21(D)(1). After Helke pled not guilty, the judge held a bench trial, at which the State presented testimony from the arresting officer, State Trooper Jerod Keyes.

The trial court found Helke guilty and imposed a fine and court costs. Helke then timely appealed from the conviction and sentence.

## II. Did the Court Err in Accepting the Trooper's Testimony?

{¶ 5} Helke's First Assignment of Error (quoted verbatim) states that:

Trial Court Erred When It Accepted Testimony Concerning the Trooper[']s Visual Estimation of the Vehicals [sic] Speed and the Operation of the Laser Speed Detector.

{¶ 6} Under this assignment of error, Helke contends that Trooper Keyes blatantly refused to bring evidence of his training into court, and that the evidence was insufficient that Keyes had completed training in the use of a laser device or in visually checking speeds of moving vehicles.

{¶ 7} As a preliminary matter, we disagree with Helke's contention that Keyes blatantly refused to bring evidence of his training into court. Helke was subpoenaed by the State, not the defense, and the subpoena did not ask Helke to bring any documents to court. See Doc. #3 and #4. If Helke wished to subpoena Keyes and require that he bring documents to court, Helke had the ability to do so.

{¶ 8} At trial, Keyes testified that on March 25, 2015, he had been employed as a State Trooper for eight years, and was on stationary patrol on Interstate 75 at mile post 50, running a laser. Keyes visually estimated that a vehicle (later found to be driven by Helke), was traveling at 80 to 85 miles per hour, in excess of the 55 mile per hour posted speed limit. After activating the laser, Keyes found that the vehicle was traveling 83 miles per hour. Keyes kept his line of sight on the car until it passed him, pulled out, and

initiated a traffic stop.

{¶ 9} Keyes testified in detail at trial about his certification in the use of lasers and his training in visual observation of speed. He indicated that he had been initially trained at the police academy in using the laser. This consisted of 40 hours of training, during which he was instructed by a certified instructor on the use of radar and the laser. Keyes was also required to perform visual observations of speed and be correct within two to three miles an hour on visual observations in order to pass the class. After graduation, supervisors have ridden with Keyes yearly to ensure that he is properly using the laser and knows how to calibrate it and verify that it is working. Keyes further testified that he has had updates on the visual observation class yearly.

{¶ 10} During Helke's cross-examination of Keyes, the following exchange occurred:

Q. Okay. You also testified that you have been trained. You have been to the Academy. You know there's forty hours of worth of training. Where's the certifications? We have not seen the certifications yet.

A. Sir, if they were requested into Court I wouldn't have brought them in.

Q. But they're not here today. Correct?

A. Yes sir.

Transcript of Proceedings, pp. 13-14.

{¶ 11} We do not interpret Keyes' remarks to mean that he would refuse to bring in evidence of his certification if he had been asked to do so. From the context of the above remarks, and from Helke's use of the word "but" in responding, it appears that an

error in transcription occurred. In context, what Keyes appears to have said is that he "would" have brought his certifications in if they had been requested, followed by Helke's response – "But they're not here today." Otherwise, the exchange makes no sense.

{¶ 12} Accordingly, we disagree that Keyes blatantly refused to bring in evidence of his certifications. That does not necessarily mean that Keyes' testimony about the laser was properly admitted or that the State provided sufficient evidence to support the conviction.

A. Visual Observations of Police Officers

{¶ 13} In order to convict Helke, the State was required to prove beyond a reasonable doubt that he violated R.C. 4511.21(D)(1). This statute provides that:

(D) No person shall operate a motor vehicle, trackless trolley, or streetcar upon a street or highway as follows:

(1) At a speed exceeding fifty-five miles per hour, except upon a two-lane state route as provided in division (B)(9) of this section and upon a highway, expressway, or freeway as provided in divisions (B)(12), (13), (14), and (16) of this section * * *.

{¶ 14} The evidence proving the violation was Keyes' estimate of the vehicle's speed and the laser evidence. It is well-settled that "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). As a result, we review the trial court's evidentiary rulings for abuse of discretion. *Id.* An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " (Citations omitted.) *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 15} In the context of vehicle speed, the Supreme Court of Ohio held in 2010 that:

A police officer's unaided visual estimation of a vehicle's speed is sufficient evidence to support a conviction for speeding in violation of R.C. 4511.21(D) without independent verification of the vehicle's speed if the officer is trained, is certified by the Ohio Peace Officer Training Academy or a similar organization that develops and implements training programs to meet the needs of law-enforcement professionals and the communities they serve, and is experienced in visually estimating vehicle speed

*Barberton v. Jenney*, 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d 1047, syllabus.

{¶ 16} In its brief, the State relies on *Barberton*. However, after *Barberton* was decided, the legislature amended R.C. 4511.091 to add the following language:

(C)(1) No person shall be arrested, charged, or convicted of a violation of any provision of divisions (B) to (O) of section 4511.21 or section 4511.211 of the Revised Code or a substantially similar municipal ordinance based on a peace officer's unaided visual estimation of the speed of a motor vehicle, trackless trolley, or streetcar. This division does not do any of the following:

(a) Preclude the use by a peace officer of a stopwatch, radar, laser, or other electrical, mechanical, or digital device to determine the speed of a motor vehicle;

(b) Apply regarding any violation other than a violation of divisions (B) to (O) of section 4511.21 or section 4511.211 of the Revised Code or a

substantially similar municipal ordinance;

(c) Preclude a peace officer from testifying that the speed of operation of a motor vehicle, trackless trolley, or streetcar was at a speed greater or less than a speed described in division (A) of section 4511.21 of the Revised Code, the admission into evidence of such testimony, or preclude a conviction of a violation of that division based in whole or in part on such testimony.

R.C. 4511.091, as amended by Am. Sub. H.B. 86, 2011 Ohio Laws, Part III, 29.

**{¶ 17}** R.C. 4511.21(D)(1), which is the crime with which Helke was charged, fits within R.C. 4511.091(C)(1), and the trial court, therefore, could not have relied solely on Keyes' estimate of speed for the conviction. *See, e.g., Beachwood v. Joyner*, 2012-Ohio-5884, 984 N.E.2d 388, ¶ 17 (8th Dist.). This does not mean that Keyes' estimate was inadmissible; it simply means that the estimate, by itself, was not sufficient to prove a violation.

B. Whether Laser Evidence of Speed Was Properly Admitted

**{¶ 18}** Since Keyes' estimate of speed would not be sufficient, the speed measured by the laser would have been the only other evidence that could have proven a violation. For many years, Ohio courts have held that "the scientific accuracy of a laser device is the type of fact that can be judicially noticed." *City of Columbus v. Dawson*, 10th Dist. Franklin No. 99AP-589, 2000 WL 271766, *2 (Mar. 14, 2000), relying on *City of E. Cleveland v. Ferell*, 168 Ohio St. 298, 154 N.E.2d 630 (1958). *Accord State v. Saphire*, 2d Dist. Greene No. 2000 CA 39, 2000 WL 1803852, *3 (Dec. 8, 2000), *disapproved on other grounds, Barberton*, 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d

1047, at ¶ 16-18.[1]

**{¶ 19}** Ohio courts have generally held that "[e]stablishing the reliability of a speed-measuring device can be accomplished * * * by (1) a reported municipal court decision, (2) a reported or unreported case from the appellate court, or (3) the previous consideration of expert testimony about a specific device where the trial court notes it on the record." (Citations and footnotes omitted.) *Cincinnati v. Levine*, 158 Ohio App.3d 657, 2004-Ohio-5992, 821 N.E.2d 613, ¶ 10 (1st Dist.) *See also E. Liverpool v. Lawson*, 7th Dist. Columbiana No. 13 CO 52, 2014-Ohio-5858, ¶ 11. However, this approach has been questioned in a few recent cases.

**{¶ 20}** In 2013, the Eighth District Court of Appeals extensively discussed the evolution of speed-measuring devices, beginning with the development of radar in England in the 1930's. *See Cleveland v. Craig*, 8th Dist. Cuyahoga No. 99619, 2013-Ohio-5742, ¶ 11-22. The court noted that as "the general accuracy and effectiveness of the radar speedmeter" became commonly known and accepted, the Supreme Court of Ohio confirmed more than 50 years ago in *Ferell* that "the reliability of the scientific principles underlying the use of stationary radar could be established without the need for expert testimony." *Id.* at ¶ 13-14, citing *Ferell* at syllabus.

**{¶ 21}** The court of appeals further observed that *Ferell* failed to focus on the specific measuring device involved because all radar devices being used at the time "were stationary models using the 'S' band frequency." *Id.* at ¶ 15. However, the

---

[1] In *Barberton*, the Supreme Court of Ohio disapproved our view in *Saphire* that an officer's visual estimate of speed, alone, is insufficient to support a conviction under R.C. 4511.21(D). However, based on the amendments to R.C. 4511.091, our holding in *Saphire* is a correct statement of law.

evolution of these devices to other frequencies, and to either stationary or moving modes, changed the rules for admissibility of the results, such that "testimony or judicial notice of the construction and accuracy of moving radar devices is required to sustain a conviction based on a reading from such device." (Citations omitted). *Id.* at ¶ 15-16.

**{¶ 22}** After making these observations, *Craig* discussed a prior opinion of the Eighth District Court of Appeals, which had questioned "the need to 're-prove' the science behind speed measuring devices in every case where an expert did not testify or judicial notice could not be taken." *Id.* at ¶ 17, quoting *Cleveland v. Tisdale*, 8th Dist. Cuyahoga No. 89877, 2008-Ohio-2807, ¶ 15. In *Tisdale*, the Eighth District Court of Appeals noted that:

> In *Ferell*, the device in use was a stationary radar device operating on the "Doppler effect." *Ferell* set the admissibility requirements until new technology changed that standard. As stated in *State v. Wilcox* (1974), 40 Ohio App.2d 380, 319 N.E.2d 615: " * * * a radar speed-detection device using the Doppler principle is recognized scientifically, even in the absence of expert testimony with respect to its construction and method of operation, [but] we do not feel that this principle can be extended to a device which not only measures speed but adjusts such speed measurement for the speed of the vehicle in which it is mounted. This is especially true in the absence of any evidence that the device in question can, in fact, accomplish that purpose. It is only by inference that this conclusion could be reached from the evidence herein."

> Thus, *Ferell* had been limited to situations involving the use of

stationary radar devices. The advent of newer speed measuring devices transformed the admissibility standard, and Ohio courts once again were requiring expert testimony.

*Tisdale* at ¶ 11-12.

**{¶ 23}** In this regard, the panel in *Craig* stated that "We felt [in *Tisdale* that] a compelling argument could be made that 'all radar-based speed measuring devices in use today, and arguably all laser-based units now in use, are reliable, even in the absence of expert testimony as to their reliability.' " *Craig*, 8th Dist. Cuyahoga No. 99619, 2013-Ohio-5742, at ¶ 17. *Craig* noted that *Tisdale* had been cited by some cases for its changed approach, but had also been criticized by others, even in the Eighth District, for moving "away from the traditional method of establishing admissibility of speed measuring device results." (Citations omitted.). *Id.* at ¶ 19.

**{¶ 24}** The court of appeals went on to state in *Craig* that:

In any event, virtually all the cases following *Ferell* acknowledged the distinction between the use of stationary radar and moving radar or laser devices. The question today is, how should we apply the principle in *Ferell*, over 55 years later, in a changed landscape littered with new technology?

Was the court in *Ferell* taking judicial notice only of the underlying principles of radar as an electronic device that scientifically and accurately measures the speed of a moving object? Or were they only judicially noticing the accuracy and operating efficiency of the particular radar device used to measure the speed of *Ferell's* vehicle in that case before the court? As noted earlier, the specific device at play in *Ferell* was not identified,

suggesting the court was giving its tacit blessing to all stationary radar devices. What was not addressed, and what was unknown to the justices at the time, was how the technology would evolve and improve with the introduction of new, more advanced measuring instruments.

*Craig*, 8th Dist. Cuyahoga No. 99619, 2013-Ohio-5742, at ¶ 19-20.

**{¶ 25}** According to the panel in *Craig*, the problem of focusing on specific devices is that the movement to include moving and laser-based devices, " 'has evolved into a device- and jurisdiction-specific inquiry, and has returned us to a pre-*Ferell* state of "[wasting] the time of experts * * * and [increasing] the expenses of litigation * * * by compelling such [experts] to appear in court after court telling the same truths over and over[.]" ' " *Id.* at ¶ 21, quoting *State v. Freiteg,* 9th Dist. Wayne No. 07CA0082, 2008-Ohio-6573, ¶ 25 (Whitmore, J., dissenting). (Other citations omitted.)

**{¶ 26}** The Eighth District Court of Appeals thus concluded in *Craig* that:

While *Ferell* has been viewed as an outdated opinion by some, we view the rationale concerning the general acceptance of the scientific reliability of radar as a device for measuring speed should continue to be applied to stationary radar devices in use today. Unless and until the Ohio Supreme Court states otherwise, at least insofar as stationary devices are concerned, we shall continue to adhere to *Ferell's* holding that "readings of a radar speed meter may be accepted in evidence * * * without the necessity of offering expert testimony as to the scientific principles underlying them." *Ferell*, 168 Ohio St. at 303, 154 N.E.2d 630. Further, in light of the increasing debate among appellate courts, we would encourage the Ohio

Supreme Court to consider whether expert testimony should be required to establish the general reliability of moving-radar and laser speed devices. Arguably, both radar and laser technology are now commonly accepted and recognized methods for reliably and accurately measuring the speed of a moving vehicle. The need to revisit the issue of judicial notice is compelling.

*Craig* at ¶ 22.

{¶ 27} A further criticism in both *Tisdale* and *Craig* involves how judicial notice is employed. In particular, these cases " 'question the practical limitations of judicial notice being limited to the territorial jurisdiction of the court and believe the Ohio Supreme Court may wish to re-examine the standard in terms of cross-jurisdictional judicial notice.' " *Craig* at ¶ 25, quoting *Tisdale*, 8th Dist. Cuyahoga No. 89877, 2008-Ohio-2807, at ¶ 14. The Supreme Court of Ohio has not acted upon these invitations.[2]

---

[2] An additional suggestion for addressing this issue could be the adoption of legislation like R.C. 4511.19, which, according to *State v. Vega*, 12 Ohio St.3d 185, 465 N.E.2d 1303 (1984), prohibits defendants charged with operating a motor vehicle while under the influence of alcohol from attacking the general scientific reliability of breath-testing instruments. *Id.* at 190. *See also Cincinnati v. Ilg*, 141 Ohio St.3d 22, 2014-Ohio-4258, 21 N.E.3d 278, ¶ 23 (affirming this principle). In *Vega*, the Supreme Court of Ohio stated that R.C. 4511.19 represents a legislative determination that breath testing devices adopted by the Director of the Ohio Department of Health are generally reliable. *Vega* at 188-189. The Supreme Court of Ohio also held that "an accused is not denied his constitutional right to present a defense nor is the state relieved of its burden of proving guilt beyond a reasonable doubt where a trial judge does not permit expert testimony to attack the reliability of intoxilyers in general." *Id.* at 186. The basis for this conclusion is that the statute "merely raises the rebuttable presumption that one was under the influence of alcohol. Under the statute, the accused may introduce any other competent evidence bearing upon the question of whether he was under the influence of intoxicating liquor." *Id.* at 189. In *Ilg*, the Supreme Court of Ohio stressed that "the director's approval of the Intoxilyzer 8000 does not preclude an accused from challenging the accuracy, competence, admissibility, relevance, authenticity, or credibility of specific tests results at issue in a pending case." *Ilg* at ¶ 29.

{¶ 28} In *Craig*, the court of appeals ultimately considered the radar testimony only on the basis of plain error, since the defendant failed to object at trial. *Craig*, 8th Dist. Cuyahoga No. 99619, 2013-Ohio-5742, at ¶ 28. Under circumstances that are similar to those in the case before us, the court of appeals concluded that the trial court did not err in admitting the officer's testimony as to speed or in basing its finding of guilt on the testimony. *Id.* at ¶ 10 and 31. While the court agreed that "an officer's unaided visual estimation of speed could not form the basis for his conviction," the court stressed that "in this case, the officer testified that the stationary radar verified his observation. As a stationary radar unit was involved, expert testimony was not required." (Citations omitted.) *Id.* at ¶ 31. Of course, the case before us involves a laser device, not stationary radar, and this is an important distinction, as even *Craig* and *Tisdale* recognized that lasers and moving radar were not included in *Ferell*. Unlike *Craig* and *Tisdale*, which involved radar, the case before us involves a laser speed measuring device.

{¶ 29} *Craig* has not been cited since it was decided in 2013, and another panel of the Eighth District Court of Appeals had previously criticized *Tisdale*. *See Beachwood*, 2012-Ohio-5884, 984 N.E.2d 388, at ¶ 13 (8th Dist.) (describing *Tisdale* as "an outlier of the well-established body of law on the issue.")

{¶ 30} Some courts have taken a somewhat different approach than the dissenting cases in the Eighth District. For example:

[C]ourts have concluded that expert testimony regarding the reliability of various models of laser and radar devices is irrelevant for purposes of judicial notice because "[i]t is the scientific principle underlying a device's

reliability – and not the reliability of a specific model – that renders judicial notice proper." *State v. Wiest*, Hamilton App. No. C–070609, 2008-Ohio-1433, ¶ 12; *State v. Yaun*, Logan App. No. 8-07-22, 2008-Ohio-1902, ¶ 18. In *Yaun*, the Third Appellate District determined that the trial court did not err in taking judicial notice of the Python II radar device when it had previously taken judicial notice of the K–55 device. *Id.* at ¶ 19. The police officer in Yaun testified that the Python II radar operated on the same principle as other radar devices and that it was "exactly the same radar as the K–55." *Id.* at ¶ 14.

*State v. Starks*, 196 Ohio App.3d 589, 2011-Ohio-2344, 964 N.E.2d 1058, ¶ 24 (12th Dist.).

{¶ 31} Nonetheless, the Twelfth District Court of Appeals concluded in *Starks* that the trial court erred in taking judicial notice of an LTI ultra-light laser because there was no testimony that the LTI 20–20 (which had previously been found reliable) and the LTI ultra-light "operated under the same scientific principle such that they could be deemed different models of the same device." *Id.* In this regard, the court stressed that "[a]lthough the underlying principles of laser technology may be the same from one device to another, generally judicial notice as to the reliability of a speed-measuring device is device-specific. Therefore, expert testimony is necessary, 'whether it be a new device or an upgrade of an existing device, before the court may take judicial notice of that particular device in future proceedings.' " *Id.* at ¶ 25, quoting *State v. Kincaid*, 124 Ohio Misc.2d 92, 2003-Ohio-4632, 796 N.E.2d 89, ¶ 15 (C.C.).

{¶ 32} Our own district has taken judicial notice of the scientific reliability of the K-

55 radar device, and has held that expert testimony is no longer necessary based on *Ferell*. *See, e.g., State v. Knife*, 2d Dist. Miami No. 88 CA 41, 1989 WL 87572, \*2 (Aug. 2, 1989); *Xenia v. Boehman*, 114 Ohio App.3d 78, 83, 682 N.E.2d 1029 (2d Dist.1996).

**{¶ 33}** Our first consideration of lasers appears to have been in 1994, when we concluded that under the expert testimony presented in that case, a laser device identified as the "LTI 20/20" was scientifically reliable. *State v. Reck*, 2d Dist. Darke No. 1352 CA, 1994 WL 718230, \*6 (Dec. 21, 1994). Subsequently, in 2000, the issue of the scientific reliability of a laser device was again before our court. *Saphire*, 2d Dist. Greene No. 2000 CA 39, 2000 WL 1803852, at \*2. In that case, the trial court did not hear expert evidence on the issue, but took judicial notice of the device's accuracy and dependability based on training the trial court had attended. *Id.* at \*3. When the defendant appealed, we stated that while the scientific accuracy of a laser could be judicially noticed, the type of laser in question was not clear from the record. *Id.* at \*4. In addition, we stated that:

> Although the accurate name of the laser device used by [the officer] is unclear, it appears that neither our court nor the supreme court has taken judicial notice of any laser device with one of the names listed *supra*. Further, there was no indication in the record or in the trial court's entry that it had previously heard expert testimony regarding this particular laser device. Because there is nothing in the record to show that the trial court has ever received expert evidence on and determined that the laser device used in this case is dependable and accurate, and because it appears that no court of binding authority upon the Xenia Municipal Court has ever taken judicial notice of this laser device, we conclude that Saphire's second

assignment of error is persuasive.

(Citations omitted.) *Id.* As a result of the trial court's error, we reversed the defendant's conviction for speeding. *Id.* at *6.

**{¶ 34}** Subsequently, in 2006, we again considered whether the trial court had properly taken judicial notice of a laser speed measurement device. *State v. Pellettiere*, 2d Dist. Montgomery No. 21070, 2006-Ohio-1606, ¶ 7. The type of laser device was not identified in our opinion. We overruled the defendant's objections, stating that:

> In the present case Pellettiere, acting pro se, objected to Officer Stephenson's testimony about the use of a laser speed measurement device. Specifically, Pellettiere objected by stating "[a]s far as I know the State has not taken judicial notice on this laser device as of this moment." (Emphasis added). The court responded by stating "[t]his Court has." That statement indicates that the trial court has taken evidence in the past which permits the court to take judicial notice of that particular type of laser speed measurement device. We find it unnecessary for the trial court to specifically state the case in which it heard expert testimony on the device.

> We conclude that it was permissible for the trial court to take judicial notice that the specific laser speed measurement device in this case was accurate and reliable. Accordingly, Pellettiere's second assignment of error is not well taken and is overruled.

*Id.* at ¶ 9-10.

**{¶ 35}** We ruled to the same effect in 2008, in a case involving the Fairborn Municipal Court. *See State v. Dixon*, 2d Dist. Greene No. 06-CA-0145, 2008-Ohio-415.

In *Dixon*, the trial judge noted that she and the court's magistrate had taken judicial notice on prior occasions of the reliability of a hand-held, battery-operated laser device that was used by the officer in *Dixon*. *Id.* at ¶ 3 and 7. While the type of laser device that was being used is not identified in our opinion, the trial court did comply with the requirements for taking judicial notice.

{¶ 36} In *State v. Brooks*, 2d Dist. Montgomery Nos. 23386, 23387, 2010-Ohio-1119, we affirmed the conviction of a defendant where the officer had used a laser measuring device identified as "LTI 20/20." *Id.* at ¶ 27. However, we did not consider whether the device was reliable or whether the trial court had properly taken judicial notice. This was because the only issue raised by the defendant related to the third criterion in *Feller*, i.e., that " ' "the witness using the apparatus as the source of his testimony must be one qualified for its use by training and experience." ' " *Id.* at ¶ 24-25, quoting *Ferell*, 168 Ohio St. at 301, 154 N.E.2d 630. (Other citations omitted.) Notably, our prior opinion in *Reck* involved the same type of laser, so judicial notice would have been permitted.

{¶ 37} *Brooks* is the last decision on this issue from our district that our research has disclosed. Thus, to date, the LTI 20/20 laser is the only specific laser measuring device that has been demonstrated as scientifically reliable based on one of the methods listed in *Levine,* 158 Ohio App.3d 657, 2004-Ohio-5992, 821 N.E.2d 613, at ¶ 10. As a result, we cannot conclude that evidence as to the reliability of the laser involved in this case was properly admitted.

{¶ 38} In this regard, we must stress three facts: (1) the Ultra Light LiDAR laser device that Keyes referenced in his testimony has never been held scientifically reliable

in our district; (2) the specific model was never identified; and (3) the trial court did not take judicial notice of this model's reliability based on the court's own prior findings that this particular laser was scientifically reliable. In fact, Helke's objection to the laser being judicially noticed was overruled on other grounds. In this regard, the trial court made the following statement:

> Okay. Well, um, I'll note your objection. I'm gonna overrule it at this point. He [the Trooper] simply is testifying as to clocking you with the laser and was about to testify, I believe, as to whether or not it had been calibrated. So, I'm gonna allow him to answer the question. You're certainly free, again, in your cross examination of Trooper Keyes, to ask any questions you want to ask about it.

Transcript of Proceedings, p. 7.

{¶ 39} At the conclusion of the trial, Helke objected to the sufficiency of the evidence, based on the lack of judicial notice of the laser's reliability. Instead of indicating that the laser in question had been found reliable for any of the reasons permissible under the law, the trial court simply stated that the prosecution had met its burden of proof. *Id.* at pp. 16-17.

{¶ 40} However, this was not sufficient to establish that the laser was scientifically reliable. *Compare State v. Coates*, 5th Dist. Knox No. 14 CA 2, 2014-Ohio-3875, ¶ 15 (reversing judgment because trial court failed to take notice of reported municipal court decision or to cite prior consideration involving the laser in question); *State v. McKay*, 1st Dist. Hamilton No. C-130657, 2014-Ohio-2027, ¶ 12-15 (judgment reversed where officer failed to identify which type of Ultralyte laser device he was using, and prior case that

discussed accuracy and reliability of the LTI 20-20 laser device could not provide grounds to support taking judicial notice of the device in question); and *State v. Zhovner*, 2013-Ohio-749, 987 N.E.2d 333, ¶ 25-26 (3rd Dist.) (reversing judgment where Ultralyte laser device had not been found reliable in that appellate district, and the trial court had not previously received scientific testimony about the scientific reliability of this device.)

**{¶ 41}** Based on the preceding discussion, the trial court erred in failing to sustain Helke's objection to judicial notice and the scientific reliability of the laser evidence. The trial court did not err in admitting Trooper Keyes' testimony about his own qualifications. Helke's First Assignment of Error, therefore, is sustained in part and is overruled in part.


### III.   Sufficiency of the Evidence

**{¶ 42}** Because Helke has combined his argument about his Second and Third Assignments of Error, we will consider them together as well. These assignments of error, quoted verbatim, state that:

> Trial Court Erred by Accepting Testimony that Failed to Produce Evidence to Support the Defendant[']s Conviction Because the State Failed to Lay Proper Foundation and Demonstrate (1) the Device Was in Good Working Condition (2) for the Laser Device Being Calibrated Properly and Give an Accurate Reading and (3) Is Scientifically Reliability [sic].

> In Its Decision, the Trial Court Erred to the Prejudice of the Appellant By Finding That There Was Sufficient Evidence to Declair [sic] the Defendant Guilty. Both the Testimony of the Trooper and the Alledged [sic] Laser Device Speed Measurement Readings Should Not Have Been

Accepted as Admissible.

{¶ 43} Under these assignments of error, Helke contends, first, that Keyes failed to testify in sufficient detail about his calibration on the day of the incident; failed to testify about or show the maintenance logs for the device that day; and failed to sufficiently identify the specific laser being used. In addition, Helke contends that there was no evidence that the trial court had previously heard expert testimony about the reliability of the laser device in question. Helke argues that, as a result, the evidence was insufficient to support his conviction for speeding.

{¶ 44} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 259-60, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 45} As was noted, in order to convict Helke, the State was required to prove beyond a reasonable doubt that he violated R.C. 4511.21(D)(1). This would have required proof that Helke drove his automobile at a speed greater than 55 miles per hour.

{¶ 46} We have already concluded that a conviction could not rely solely on Keyes' visual observations of speed. In view of that fact, other evidence, like the laser reading of Helke's speed, would have been required. However, since the laser device was not specifically identified, and its scientific reliability was not established by any permitted methods, the State failed to prove the essential elements of the crime beyond a reasonable doubt. Accordingly, the parts of the Second and Third Assignments of Error that relate to these points will be sustained. The rest of Helke's argument, pertaining to Keyes' calibration of the laser and the maintenance logs, is moot, and will not be addressed.

## IV. Conclusion

{¶ 47} Helke's First Assignment of Error having been overruled in part and sustained in part, and his Second and Third Assignments of Error having been sustained in part and overruled in part as moot, the judgment of the trial court is reversed.

. . . . . . . . . . . .

FROELICH, P.J. and DONOVAN, J., concur.

Copies mailed to:

Kent J. DePoorter
Michael Helke
Hon. Frederick W. Dressel