[Cite as *State v. Jones*, 2016-Ohio-7413.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 26999 |
| | : | |
| v. | : | T.C. NO. 15TRD8708 |
| | : | |
| MORGAN C. JONES | : | (Criminal appeal from |
| | : | Kettering Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___21st___ day of _____October_____, 2016.

. . . . . . . . . . .

JOHN D. EVERETT, Atty. Reg. No. 0069911, Prosecuting Attorney, 2325 Wilmington Pike, Kettering, Ohio 45420
         Attorney for Plaintiff-Appellee

GEORGE A. KATCHMER, Atty. Reg. No. 0005031, 1886 Brock Road N.E., Bloomingburg, Ohio 43106
         Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} This matter is before the Court on the January 22, 2016 Notice of Appeal of Morgan C. Jones. Jones was convicted on December 23, 2015, following a bench trial in Kettering Municipal Court, on one charge of speeding, in violation of section 434.03 of the Codified Ordinances of the City of Kettering, and one charge of improper display of a

license plate, in violation of section 436.09 of the Codified Ordinances of the City of Kettering, both minor misdemeanors. Jones was fined $150.00 for each offense, and his license was suspended for 30 days, with the exception of driving privileges for work. We hereby affirm the judgment of the municipal court.

{¶ 2} Jones was stopped and cited on Wilmington Pike on November 5, 2015, by City of Kettering police officer Eric Rustad. On November 9, 2015, Jones, acting pro se, filed "Defendant's Discovery Request Pursuant to Rule 16 of the Ohio Rules, for Criminal Procedure." On November 12, 2015, Jones pled not guilty, and the court set the matter for trial on December 3, 2015. The next day, Jones filed "Defendant's Motion for Brady Material." Two days later, Jones filed "Defendant's Motion for Jury Trial." On November 19, 2015, Jones filed "Defendant's Motion in Limine to Exclude Law Enforcement Records." The next day, Jones filed two "Defendant's Request for Praecipe for Subpoena," seeking the subpoena of "Richard B. McCreary aka 'Certification Engineer,' " as well as "Kettering Police Department employees Michael Walker aka 'Custodian of Records' and Larry Warren."

{¶ 3} On November 25, 2015, the court issued a decision overruling Jones' motion for a trial by jury, noting that the charges "herein being minor misdemeanor offenses, and neither charge carrying the potential of any jail time or fines in excess of one thousand dollars, Defendant is not entitled to a Jury Trial," pursuant to R.C. 2945.17.

{¶ 4} On November 30, 2015, Jones filed "Defendant's Motion to Dismiss," asserting in part that minor misdemeanors are "serious enough to permit defendants the right to a jury trial," and that his right to due process was violated by the State's failure to respond to his discovery request and produce Brady material. Jones further asserted

that the absence of a front license plate on his vehicle calls into question the accuracy of the speed detection device used to record his speed, and that Rustad "has not been certified in the operation of the specific LTI UltraLyte device he used to allegedly detect defendant's speed." Attached to the motion are copies of Jones' request for discovery; correspondence from Jones to the Kettering Police Department Custodian of Records requesting information pursuant to the Ohio Public Record Act; Jones' citation; a portion of "LTI's UltraLyte LR B User's Manual"; an "Affidavit of LIDAR Device Certification," signed by Richard B. McCreary, Certification Engineer; and a July 19, 1996 Certificate of Training issued to Rustad for the use of electronic speed measuring devices.

{¶ 5} On December 1, 2015, the City of Kettering filed a "Motion to Quash Defendant's Subpoena" that provides that Richard McCreary resides in Franklin County and that Jones "has not tendered to Mr. McCreary his fees or mileage." Jones then filed "Defendant's Motion to Strike Plaintiff's Motion to Quash Defendant's Subpoena and Request for Sanctions against the Prosecutor," as well as "Defendant's Motion for Court to Order State to Certify They Have Complied with Request for Brady Material."

{¶ 6} On December 3, 2015, at the start of trial, Jones indicated that he received nothing from the prosecutor in response to his requests for discovery and Brady material. The following exchange occurred:

> COURT: Uh, Mr. Everett do you have anything that you want to say in response to the Motion for Brady Material?
>
> EVERETT: Well let me start with the discovery request, your Honor. That was never served on the Prosecutor's Office so I have no knowledge of a discovery request.

JONES:   Your Honor if you look on the docket it's, it's time-stamped on the docket. * * *

EVERETT:   The rules say very clearly your Honor, it must be served upon the prosecuting attorney.

* * *

JONES:   Well, your Honor, at that time I asked to go speak to him. They said that he is not, he wasn't there at that time.   As you know, there's um, the trial date was set uh, I mean there hasn't been a lotta time since the tic-ticket was issued.   So there's a lot of constraints on time.

COURT: * * *   Do you have any specific thing that you're indicating has been denied you other than just a general failure to respond to the discovery request? * * *

JONES:   Yes.

COURT:   I'd like you to make a record of what you think that that may be so that that we can address that, if in fact there is something.

JONES:   Okay.

COURT:   He can't respond to a general request with . . .

JONES:   * * * Um, as a result of the Prosecutor, and I knew he would do this.   It's common strategy used by the State * * *, Rule 16's you know, used by the defense.   So I um, utilized the, the public records request process and I submitted four public records requests.   Three to the police department in Kettering.   And then um, another one um, that the Law Department with the City of Kettering provided a huge stack of documents.

Um, there are a lot of documents that they provided that the Prosecutor . . . and this is a separate activity. This has nothing to do with this case. Um, it's, it's a separate process. It's independent of the Court and any motions I filed. Um, and I received a lot of documentation. I received documentation regarding the type of device that was used. Uh, the training certificates for the officer, which I requested in that. There was also an admission by multiple people I spoke to uh, regarding um, repair efforts and were they possessed. [Sic] And that these things do break. Um, um, there was, you know information provided me that identified a business in Columbus, Ohio. Richard McCreary is a person that uh, on one of the certifications for calibration. He was identified as a technician that * * * signed off on that. Um, I filed a subpoena and for some reason Richard McCreary was um, contacted and said there's a scheduling conflict and he's been released. But the, the State files a motion stating that uh, he wants it quashed because Mr. McCreary's been begging for me to contact him to uh, arrange for reimbursement. Which was totally false. * * *Um, so uh, you know, there's a lot of motions here that have been filed uh, regarding discovery. My ability to get * * * an expert in here. Even the Court recognizes as a credible person. * * *I've just had one road block after another. And I, I don't feel like at this point um, I can fairly, receive a fair trial based on the State's um, inability or unwillingness to cooperate with discovery.

COURT: Mr. Everett do you care to respond to that? And uh,

specifically maybe to the Motion to Quash. And indicate for the record why that was filed.

EVERETT: Well let's go back to the Brady Motion, your Honor. None of the evidence that he has talked about is exculpatory so it is not Brady material. Further, your Honor, I am part of the Kettering Law Department. All of the stuff that was provided to him was provided through my office. So he's actually received all of the material that he needs. And he just admitted he received all the material he needs. Uh, at this point he's playing games. Lastly, your Honor, there's a Ohio Supreme Court opinion that says a request for public records is a discovery request when it involves a traffic matter. Thus a response to that would be a response from the State with regards to discovery. Again, I was never served with Discovery. Let's go to the Brady Motion. I was never served with the Brady Motion. * * * Uh, but none of the material he has talked about is exculpatory. It must be denied.

JONES: Your Honor, maintenance records that reflect the dependability and the reliability of a device that's used to detect the speed of any person uh, should be * * * considered * * * very valuable to * * * either side. * * * I was pulled over. Detained. I'm in Court. If I didn't show up here today you would have issued a bench warrant for my arrest. So there are residual effects associated with these minor cases. * * *

* * *

JONES: So that is exculpatory evidence.

COURT: * * * Is there any material that you feel that you do not have that compromises your ability to represent yourself today. And if you would, say what that is.

JONES: Yes, your Honor. Um, the, the maintenance record of the speed detection device. The LTI Ultra Light um, everything associated with that. Once it goes in record, all maintenance that's been, been done on that. It's no different than Car Fax.

COURT: Alright.

JONES: it's a multibillion dollar industry. Before people buy a car, they buy a house, there are data bases out there that educate people on the reliability of them. Whether or not they're dependable.

COURT: Let's move forward then to the next matter that you filed.

{¶ 7} Regarding Jones' motion for a jury trial, the court noted that it overruled the motion in a written decision, and that Jones "then filed a Motion to Dismiss. In large part the grounds asserted in that motion are the denial of your right, what you claim to be your right to a jury trial in this case." Jones then asserted that the law denying a jury trial for a minor misdemeanor is unconstitutional. The court overruled the motion "to the extent that [it is] predicated on the denial of a jury trial."

{¶ 8} The following exchange occurred:

COURT: Now you've indicated that you want the expert witness to testify for you, is that correct?

JONES: Yes. Yes. And he communicated to me he'd be more than happy and willing to do that.

COURT: * * * So in essence are you asking me to continue the trial to have an opportunity . . .

JONES:   No.   I want this tried today.   It's my constitutional rights to have a fast and speedy trial.   So.

COURT:   Well you filed the motions that have put us where we are today.   Um, what I am going to do, I am going to reschedule the trial because I am not going to create an error.   I'm going to give you the opportunity to subpoena * * * your expert witness.   * * *

JONES:   Well, you Honor, I don't need the witness at this point.

* * *

JONES:   So I withdraw that subpoena.

COURT:   You've indicated that you've been denied that right.   And, and I don't want you to be denied that right.   You've seemed to indicate that you don't have everything that you need from the Prosecutor to go forward.   So I'm going to continue the trial * * * for a couple more weeks in order to make sure that you have everything that you need and you get the fairest trial possible.

JONES:   Well, your Honor, I * * * want to urge you to continue today. I said verbally right now, I don't need that expert witness at all.   Okay.

* * *

JONES:   Um, I have enough evidence in other, other, in my case to, to present to the Court.   The police officer that was, hasn't even showed up.   So, by default this should be dismissed.

COURT:   Okay.

JONES: Um, the other two uh, police officers . . .

EVERETT:   Sir.

JONES:   I don't know who he is.

EVERETT:   This is the police officer who cited you and stopped you.

JONES:   Okay.   Okay.   So, so there are other activities that I want to be able to question him now.

COURT:   Okay.

JONES:   And I, I think based on that we, you could make a decision today and uh, there are other expert witnesses I can get, you know later.

COURT:   No.   We're going to deal with it all at the same time.

JONES:   Well I'm telling you I'm . . .

COURT:   I'm dealing with the motions today and I'm going to, you're going to get everything that you're entitled to.

JONES:   I know what you're trying to do, your Honor.

COURT:   I'm not trying to do anything sir.

JONES:   Yeah you are.

COURT:   I'm trying to avoid creating a situation.   And I don't know whether the evidence is there to convict you or not.   If it is I do not want an appeal based on the fact that you're in Court indicating that you haven't been provided discovery.   That a witness that you subpoenaed * * * was denied you.   The Court did nothing to deny you that witness.   If you properly subpoenaed the witness.   Tender the fees.   The witness will be

here. * * *

JONES: Well, your Honor, I object to that. I want to be on the record. I verbally said right now that could [sic], subpoena that I requested and that expert is not needed to continue 'cause I have other affirmative defenses that I've [sic] clearly feel are strong enough to present to the Court today and defend myself.

COURT: * * * Well, we're going to reset this to allow at a time when the Court's docket permits sufficient time for you to present your entire case and to give you the opportunity, and if you choose not to call your expert witness that is your decision. But I'm not going to deny you that ability. * * *

JONES: * * * I want to file a verbal motion for dismissal based on the fact that my Constitutional rights to a fast and speedy trial have been denied.

COURT: I will overrule your motion to dismiss on speedy trial grounds.

* * *

COURT: * * * Now, as I've indicated before Mr. Everett committed no wrongdoing in filing a Motion to Quash to avoid a witness having to come from Columbus, Ohio who has not been properly tendered fees at the time that you filed the subpoena.

* * *

COURT: If you've worked out a financial agreement . . . I understand

everything that you said in your motion. I'm overruling your Motion for Sanctions. I'm overruling your Motion to Strike the Motion to Quash. We're setting a new court date. You have an opportunity to have the witness that you subpoenaed that was, the subpoena was quashed. You may re-subpoena him. And you will have the ability to have that witness here in your defense. So you have been prejudiced in no way. * * *

{¶ 9} On December 4, 2015, Jones filed "Defendant's Motion to disqualify Prosecutor John D. Everett and the Office of the Kettering Prosecutor and Appointment of a Special Prosecutor." Jones subsequently filed "Defendant's Notice to the Court that the Speedy Trial Period has Expired and Defendant still has not Waived his Rights to a Speedy Trial." Jones then filed a "Motion for Hearing" on his request for a special prosecutor. Jones also caused subpoenaes to be issued to the Custodian of Records of Kettering Police Department, the Custodian of Records of Ohio Calibration Laboratories, and the Custodian of Records of Google, Inc. On December 18, 2015, the City of Kettering filed a "Motion to Compel Discovery."

{¶ 10} On December 22, 2015, "Defendant's Response to Plaintiff's Motion to Compel Discovery" was filed. The court subsequently issued an "Entry Granting State's Motion to Compel Discovery." On December 23, 2015, Jones filed a "Notice of Service of Defendant's Answers and Trial Period has Expired and Responses to Plaintiff's Discovery Request."

{¶ 11} Trial commenced on December 23, 2015. At the start thereof, Jones indicated to the court that a video of a portion of the traffic stop taken by him in his vehicle is "a part of my evidence" and that he intended to present it at trial. After the prosecutor

indicated that he had not viewed the video, Jones indicated that the prosecutor never responded to his discovery requests, and that Jones "has to use the subpoena process and also public records request[s] to get anything from anyone." Jones stated that he provided the video to the prosecutor on the morning of trial.

{¶ 12} After the trial court granted the prosecutor time to view the video, the prosecutor indicated that the video appeared to be altered and objected to its admission. Jones advised the court that he blurred the logo on the shirt he wore on the date of the stop which reflected the name of his employer, but that he also had an unaltered copy of the video. The prosecutor objected to the unaltered video on the basis of relevance, and the court deferred ruling on the objection.

{¶ 13} The court next addressed Jones' motion for Brady material as follows:

COURT: * * * You've got a Motion for Brady Material. Have you provided him everything that is relevant to him on the issues of guilt and/or punishment * * * Mr. Everett?

EVERETT: Yes, your Honor.

COURT: * * * We'll consider that motion disposed of then.

JONES: * * * Can I have a response to that?

COURT: Sure.

JONES: * * * There, there was Brady material that wasn't disclosed. Um, I submitted three uh, actually four public records requests uh, for the maintenance records of the speed detection device.

COURT: Um huh.

JONES: And every time I was told that it's never been, never an

issue since 2002. Never an issue with this device. It's like engineers from space must have created this thing for it never to have any issues. It wasn't until I * * * submitted a subpoena to the Ohio Calibration Laboratories in Columbus that they actually provided me documentation that it, there had been issues with it. It has been repaired. I think a device that, that's used to detect the speed of people that results in uh, the collection of fines * * *.

COURT: Well then you got that information. But, but you now have that information so you're not prejudiced by his uh, his not giving it to you.

JONES: Well it should have been provided by the Prosecutor and even the . . .

COURT: Were you aware * * * of such an issue that he's talking about? Are you aware of any such thing?

EVERETT: No your Honor.

COURT: * * * Well if he doesn't know about it he can't give it to you.

JONES: Well your Honor, in the documentation I received from the Prosecution yesterday it was included.

* * *

COURT: Well uh, he * * * said that he's complied, he's provided you all Brady materials so that motion is, unless something pops up during the trial, that motion is disposed of.

JONES: Okay.

**{¶ 14}** The court next denied Jones' motion to exclude law enforcement records,

noting that such a motion in limine in a bench trial is "not really appropriate." Regarding Jones' motion to dismiss the matter, the following exchange occurred:

EVERETT: The Motion to Dismiss the case I believe is based on speedy trial your Honor. All speedy trial was told [sic] based on the motions filed by Mr. Jones and for the fact that this Court in the interests of justice continued this case to give Mr. Jones a chance to bring in his witnesses. So I ask that be overruled.

* * *

JONES: * * * There are multiple reason [sic] that I asked for a motion to dismiss. One, it would have been a violation of my rights, constitutional uh, federal and state constitutional rights to have a jury. * * * The second one involved, um, through the, the public records request that, that device that's being utilized by the officer um, no, the information provided me at that time shows that he was not actually trained in the device. * * *

COURT: Well you're correct that the Constitution doesn't carve out an, an exception on your right to a jury trial for speeding cases. * * *

* * *

COURT: So I'm gonna overrule that part. And your questions about the officer, those go, those doesn't go to a motion to dismiss at this point. Those may go to his credibility or his ability to offer certain testimony at trial.

JONES: Right.

COURT: But it doesn't get you, it doesn't get a motion to dismiss. So I'm gonna overrule that motion.

**{¶ 15}** Regarding "Defendant's Motion to Strike Plaintiff's Motion to Quash Defendant's Subpoena and Request for Sanctions," the following exchange occurred:

EVERETT: * * * The Defendant subpoenaed Dick McCreary who is an expert at Calibration Labs. He's filed that subpoena without sending the necessary money to the uh, subpoenaed witness. Mr. McCreary called me up and asked if I would file a Motion to Quash on his behalf and I did uh, requesting that the subpoena be quashed. That was for the original trial.

* * *

THE COURT: Has he been re-subpoenaed for this trial?

JONES: Yes, and he's not shown up.

COURT: * * * Did you give him mileage and the other requirements?

JONES: Yeah. I gave him all that. He wanted $2,000.00.

* * *

COURT: I'm gonna overrule that motion also.

**{¶ 16}** Regarding Jones' motion to disqualify the prosecutor, the following exchange occurred in part:

COURT: * * * [W]hat's your grounds for this Mr. Jones?

JONES: * * * Uh, your Honor, in the trial session. This is a continuation of that trial. This isn't a new trial. Um, the prosecutor said that he is a member of the * * * Kettering Law Department. Which also represents the Kettering Police Department. Those are two different roles

that should * * * involve independent activities. * * * He's never responded * * * to my discovery requests. * * * I think there is a conflict of interest there. * * *

COURT: What would the conflict of interest be?

JONES: Well a public servant who knowingly or intentionally commits an offense in the performance of public servants' official duties. * * * His * * * efforts in not participating in discovery as a prosecutor. * * *

COURT: And if, because he didn't give you your discovery in the way you wanted it quickly enough or what you wanted, is that the gist of your complaint against him?

JONES: Well I was forced to use subpoenas and the public records request. * * *

* * *

COURT: Uh, the police and the prosecutor's office are part of the executive branch of government.

JONES: Yep.

COURT: I'm part of the judicial branch as I sit here. They're separate. And the executive branch encompasses both the police, law enforcement function and the prosecutorial function. And so * * * him representing the police department and the City of Kettering as an entity are wholly proper because * * * that falls under the powers and authorities of the executive branch. There's no conflict there. * * *

JONES: Yep.

COURT: So that's the normal function of the prosecutor. * * * I'm not gonna remove him. So that motion's overruled.

**{¶ 17}** Finally, the court indicated, "you've got a motion on speedy trial. I'm gonna overrule that." After the court ruled on the motions, Jones moved the court for a separation of witnesses, and the court granted the motion, indicating, "Anybody who's gonna testify has to remain outside of the courtroom. You're not to talk to each other although you may talk to counsel."

**{¶ 18}** Eric Rustad testified that he is a City of Kettering police officer with over 20 years of experience, and that for the last six years, his sole responsibility has been to enforce traffic laws. He stated that on November 5, 2015, at about 8:43 a.m., he was in the uniform of the day on a motorcycle at the 4300 block of Wilmington Pike, directly across from Glenmina Avenue. Rustad stated that he observed a vehicle later confirmed to be driven by Jones traveling northbound at a high rate of speed. Rustad stated that his partner, Officer Tischler, was to his left on a motorcycle as well and observed Jones' vehicle. Rustad stated that he estimated Jones' vehicle to be travelling at "at least fifty-three miles an hour." Rustad stated that he "activated the speed measurement device on the front portion of the vehicle and received a * * * speed reading of fifty-four miles an hour."

**{¶ 19}** Rustad stated that the weather was sunny, he had a clear line of sight, and Jones' vehicle was the only one travelling northbound at the time. Rustad stated that he utilized his LTI Ultra Light LRB to determine Jones' speed. He identified a copy of a certification from a 40-hour course he completed that was issued by the Highway Patrol Academy in speed measurement "for not only LIDAR laser * * * but for radar as well." He

further identified certification from the Highway Patrol Academy for another 40-hour course he completed "to give me the Instructor Certification for Speed-measuring."

{¶ 20} Rustad testified that every morning that he intends to use his speed measuring device he performs "accuracy checks. I do a two-point method based on distance which is the science behind speed measurement. The time of flight from the device to a fixed object and back. I do that within the police department." Rustad testified that he tested the device on the morning that he stopped Jones, and that it was accurate in terms of distance. He stated that he checked the LEDs and confirmed that they were functional. He testified that there were no problems with the device. Rustad testified that he also verifies the accuracy of the device in the course of his day based upon "known distances," such as "a school zone that I patrol nearly daily." Rustad stated that every year the device is sent to Ohio Calibration Laboratories for a "gambit" of accuracy and function tests.

{¶ 21} In determining Jones' speed, Rustad stated that he depressed the trigger on the device with the "illuminated dot on the front license plate area of the vehicle" and obtained the speed reading. He stated that Jones' vehicle "was 793 feet away if I'm not mistaken" from where he was seated on his motorcycle. Rustad stated that he has been trained in the use of the specific device he used that day, and that he uses it every day in the course of his work. He stated that he used the device according to his training and experience. Rustad stated that Jones was travelling 54 miles an hour in a posted 40 mile per hour zone. Rustad stated that while he aims the device in the area of the license plate, "you only need * * * a surface." He stated that "any object that is, that is a solid object you can get a reading from." Rustad stated that Jones was driving a Porsche

Boxster without a front license plate.

{¶ 22} Rustad stated that if he is unable to obtain a reading, the device displays an error number.   In this instance, he stated "I literally shot the vehicle one time with this measurement device.   Had absolutely no problem picking it up."   Rustad described the particular area of Wilmington Pike as "a relatively flat wide portion of the roadway with * * * no obstructions from * * * trees or * * * guide wires or any other traffic at that time." He stated that the stop was in a residential area with "some businesses."

{¶ 23} Rustad stated that upon obtaining Jones' speed, he placed the device in his scabbard, started his motorcycle and effected the stop.   He stated that he "called the plate in" and approached the vehicle.   According to Rustad, he introduced himself to Jones, advised him that he clocked him at 54 miles an hour in a 40 mile-per-hour zone, and asked for his license and insurance card.   Rustad stated that he asked Jones if the address on his license was current, and that Jones responded, "Sure."   He stated that he asked Jones for his phone number, and that Jones responded, "000000."   Rustad stated that he advised Jones that he failed to display a front license plate as required by law, and that Jones responded, "[G]o ahead and cite me.   I'm gonna get out of this anyways."   Rustad stated that he cited Jones for speeding and failure to display a front license plate. In response to questions from the court, Rustad indicated that the device he uses is "issued to me and the motorcycle. * * * Vehicle number is 441.   * * *   It is always in my * * * care."

{¶ 24}  When asked by Jones on cross-examination about his familiarity with the manual associated with the device at issue and the specific instructions provided therein regarding the area at which to aim the device, Rustad testified that the manual "asks for

the front license plate area of the vehicle."   He testified that the device "doesn't need a license plate * * * to get a reading."   According to Rustad, "You aim at the front license portion of the vehicle and it either will or will not give you a reading. Which, in fact, with your vehicle it immediately did." Rustad stated that his training certifications presented on direct examination are from 1996 and 1998. Rustad stated that the device he uses was manufactured in January of 2006.   He stated that he obtained the device in May of 2009. Rustad stated that the training he received "was based on the science behind * * * speed measurement.   Not with specific devices as devices obviously will change over the years."

{¶ 25}   The following exchange occurred:

Q.   Um, when you determined the speed of the * * * Defendant were you standing or were you sitting on your motorcycle?

A.   I was seated.

Q.   You were seated.   Are you familiar with the section of the manual where it tells you not to sit on your motorcycle?

A.   No.

* * *

COURT:   Was your motorcycle running or the engine off?

A.   No.   Engine's off.   I'm in a * * * comfortable seated braced position when using it.

COURT:   Now was your motorcycle pointed which way?

A.   Towards the roadway.   Wilmington Pike.   So I was seated in accordance with its use.

* * *

Q.   So, if the manual states that you should not be * * * sitting on your motorcycle while you're using the device, would one, would you believe that you're not following the procedures of the user's manual for that device?

EVERETT:   Objection.   That's a hypothetical, your Honor. He said he does not that it was in the manual. [Sic].

COURT:   I'll sustain it.   If we get some testimony * * * that it's in the manual then we'll talk about it.   We can talk about that later.

JONES:   Okay.

Have you ever read the manual?

A.   Yes I have.

Q.   So * * * you're familiar with, are you familiar with the section in the manual where it instructs you, an officer you know, trying to determine the, the speed of * * * a person, not to sit on their motorcycle?

A.   No.   If you have it, I'd like to read it.

Q.   I actually don't have it with me right here.

COURT:   Oh.   Well then you're not gonna present evidence to that effect?

JONES:   No.

COURT:   Well then move on.

{¶ 26} The following exchange occurred regarding a document purportedly responsive to Jones' subpoena to Google, Inc.:

Q. * * * Your Honor, I want to present the, the officer a document that I received through a subpoena through Google regarding, it's a Waze application.

COURT: Did * * *you print something out or did you subpoena something from Google?

JONES: I subpoenaed something from Google.

COURT: Oh really. Let me see what that was. You issued a subpoena to them and they sent you this?

JONES: Yeah.

COURT: No kidding.

* * *

COURT: I can tell you that the Court's * * * fairly familiar with the area.

JONES: Yeah.

COURT: So if you want to talk about it * * * I know the area reasonably well.

JONES: * * * May I approach the witness?

COURT: Absolutely.

Q. This is * * *actually an application that's used on my phone . . .

COURT: Well just ask him questions about the drawing. We don't need, you don't need to authenticate it.

JONES: Okay.

COURT: I recognize it.

* * *

Q.   Um, can you identify * * * the shopping center and your position that was identified by the Waze application in this depiction?

A.   I cannot.

EVERETT:   Your Honor, I'm gonna object.   He can't identify something . . .

COURT:   Yeah.   He doesn't, he doesn't know what a Waze application or Google or where it came from.   It's a map of the Wilmington Pike area of Kettering.   Ask him questions about what's depicted on the map.

* * *

Q.   On the map, where do you see the police symbol located at?

COURT:   Well that's a, now, you put that on there.   Ask him if that's where he was?   Ask him if that symbol indicates where he was accurately or whether it's inaccurate.

* * *

Q.   Is that an accurate depiction of where your location was when you um, detected the speed of the Defendant?

A.   Well, ultimately no because there are no * * * visual signs of, of. [Sic] I don't know what street this is.   I don't know what area this is.   Uh, Woodner is much, much, * * * farther to the north as is Lisbon.   * * * I can't really see what this is stating.   But uh, no it is not.

Q.   * * * Do you, do you see uh, does it depict the speed?

A. I see an icon that says '37 mph'.

Q. Would you, the acronym would, do you have a particular understanding of what that * * * acronym might be?

A. Yes.

Q. What is that?

A. Miles per hour.

Q. * * * What is the date . . .

EVERETT: Your Honor, again . . .

COURT: What, what's it say? 37 miles an hour. What * * * are you talking about?

JONES: Well the Waze application uses global positioning satellites to determine your location and the speed of your vehicle. This is an application that I use on my IPhone.

COURT: Yeah, we're not. Now I let you use that for the purposes of it being a map of the area. We're not using Google or what you did with your phone to have any testimony about speeds being above or below certain numbers.

JONES: Well this technology actually . . .

COURT: I don't want to hear about.

JONES: Your Honor . . .

COURT: You, you're, if you want to get up here and qualify it and testify about it fine.

JONES: I'm an expert with this application.

COURT:   Well, we don't know that.    You may be or you may not be.   But you haven't been qualified as one yet.

JONES:    * * * I've been using it for two years. * * *   I'm an expert at using this application.

COURT:   You ask him a question and he's probably gonna object and I'll rule on his objection.   Go ahead.

* * *

Q.   What is * * * the date listed on this?

EVERETT:   Objection, your Honor.

COURT:   I'll let him answer what the date is.   Overruled.

A.   Uh, it * * * states on that piece of paper, 'November 5, 2015'.

Q.   And then what's the time?

EVERETT:   Your Honor, again, I object.   This is stuff . . .

COURT:   * * *   I don't know where he's going with this.   I'm gonna let him say what the time is stated on the piece of paper.   Overruled.   Go ahead.

A.   It says uh, 'Family, friendly or Family Mode LTE 8:42 am'[.]

Q.   So is the date and time uh, similar to the time and date that you detected the Defendant's speed?

* * *

JONES:   Your Honor, may I provide him with the citation itself that was issue? [Sic.]

COURT:   That's up to you.

\* \* \*

JONES: Okay.

Q.   So here's a copy of the citation. Is, is there a specific time listed on citation?

A.   \* \* \* I put 08:43 which is 8:43 am.

Q.   \* \* \* And the date on the ticket?

A.   Uh, the 5th of November.

{¶ 27} After re-direct and re-cross examination, the following exchange occurred:

EVERETT:   Your Honor, I ask the Court take Judicial Notice as to the scientific reliability of the device used in this case.   This Court heard testimony on December 8th in fact, in a case involving this officer and this specific machine in which you heard an expert from LTI as to the scientific reliability and the underlying science of the machine. And I ask the Court to take Judicial Notice of that.

\* \* \*

JONES:   Well I object to that.   I wasn't, didn't participate in that.   I have no idea what \* \* \* that person testified to.   Nor did I have the ability to question or cross examine.

COURT:   That's absolutely correct.   However, what was the date again that I did that?

EVERETT: December 8th, your Honor.   It was in the City versus Pitts case.

COURT: Uh, Nathaniel Pitts. That was, and the case was, City versus Nathaniel Pitts. 15TRD08241. The * * * prosecutor for the City of Kettering did produce * * * expert testimony. Uh, the witness whose name I don't recall was qualified as an expert and testified as to the * * * inherent reliability and accuracy specifically of the LTI * * * Ultra Light device. Same one that was used in this case. And we recognized it and took Judicial Notice of it. Subject to being properly operated and appearing to be in good working order and meeting all that * * * foundational criteria. That * * * the device itself * * * is inherently accurately [sic] and fit for the purpose * * * it's intended. So we will take Judicial Notice of the inherent accuracy of the device when it's properly operated and when it's working properly.

{¶ 28} The following exchange occurred in part regarding the admission of Jones' exhibits:

COURT: Yeah. We're gonna admit, uh, we'll admit his exhibits. You don't have any objection to his exhibit, do you? Or do you?

EVERETT: No, you Honor. Except for the one that was from Waze.

* * *

COURT: I don't think it was marked either. We're gonna, I'm gonna keep it because there was testimony about it. But it's not gonna be admitted as an exhibit. I'm just gonna put it in here for what it's worth.

* * *

JONES: Your Honor, it's from my application that I use on my

phone.   * * *

> COURT:   No.   I'm not gonna admit that. * * *

**{¶ 29}**  The record reflects that on December 23, 2015, Jones filed a "Motion for New Trial."   The municipal court overruled the motion on December 31, 2015.

**{¶ 30}**  Jones asserts six assignments of error herein.   His first assignment of error is as follows:

> THE COURT IMPROPERLY TOOK JUDICIAL NOTICE OF THE ACCURACY OF A LASER DEVICE BASED UPON EVIDEDNCE OF AN UNRELATED HEARING.

**{¶ 31}** Jones asserts as follows:

> Obviously the accuracy of a specific device on a specific day cannot be generally known in the entire City of Kettering.   Nor can the reference to an unrelated trial suffice to meet the second criterion.   Nathanial Pitts, whose case was used as the basis for the judicial notice request had a complaint that was entered on October 23, 2015.   Any testimony that the device was accurately functioning on or about that date could have no bearing or relevance to the present matter which had an offense date of November 5.   Thus the accuracy of a device on an unrelated earlier date does not meet either requirement of Evid. R. 201.

**{¶ 32}** This Court, in *State v. Helke*, 2015-Ohio-4402, 46 N.E.3d 188 (2d Dist.) considered at length the circumstances under which a court may properly take judicial notice of a specific laser device's scientific reliability. This Court noted as follows:

> Ohio courts have generally held that "[e]stablishing the reliability of a

speed-measuring device can be accomplished * * * by (1) a reported municipal court decision, (2) a reported or unreported case from the appellate court, or (3) the previous consideration of expert testimony about a specific device where the trial court notes it on the record." (Citations and footnote omitted). *Cincinnati v. Levine*, 158 Ohio App.3d 657, 2004-Ohio-5992, 821 N.E. 2d 613, ¶ 10 (1st Dist.) * * *.

*Id.*, ¶ 19.

{¶ 33} After a thorough review of cases from other districts, this Court further noted as follows:

Subsequently, in 2006, we again considered whether the trial court had properly taken judicial notice of a laser speed measurement device. *State v. Pellettiere,* 2d Dist. Montgomery No. 21070, 2006-Ohio-1606, ¶ 7. The type of laser was not identified in our opinion. We overruled the defendant's objections, stating that:

In the present case Pellettiere, acting pro se, objected to Officer Stephenson's testimony about the use of a laser speed measurement device. Specifically, Pellettiere objected by stating "[a]s far as I know the State has not taken judicial notice of this device as of this moment." (Emphasis added). The court responded by stating, "[t]his Court has." That statement indicates that the trial court has taken evidence in the past which permits the court to take judicial notice of that particular type of laser speed measurement device. We find

it unnecessary for the trial court to specifically state the case in which it heard expert testimony on the device.

We conclude that it was permissible for the trial court to take judicial notice that the specific laser speed measurement device in this case was accurate and reliable. Accordingly, Pellettiere's second assignment of error is not well taken and is overruled. *Id.*, ¶ 9-10

We ruled to the same effect in 2008, in a case involving the Fairborn Municipal Court. *See State v. Dixon*, 2d Dist. Greene No. 06-CA-0145, 2008-Ohio-415. In *Dixon*, the trial judge noted that she and the court's magistrate had taken judicial notice on prior occasions of the reliability of a hand-held, battery-operated laser device that was used by the officer in *Dixon*. *Id.* at ¶ 3 and 7. While the type of laser device that was being used is not identified in our opinion, the trial court did comply with the requirements for taking judicial notice.

*Helke*, ¶ 34-35.

{¶ 34} The Twelfth District, in *State v. Sweat*, 12th Dist. Butler No. CA2015-10-184, 2016-Ohio-2680, ¶ 14, summarized this Court's holding in *Helke* as follows:

* * * [T]he Second District determined that the trial court erred by taking judicial notice of a speed-measuring device that had not been proven to be scientifically reliable. The court reasoned that the testimony regarding the speed determination was not admissible because of the lack of scientific reliability of the device, and the only remaining evidence of guilt

was the officer's visual estimation of speed. The *Helke* court concluded, "since the laser device was not specifically identified, and its scientific reliability was not established by any permitted methods, the State failed to prove the essential elements beyond a reasonable doubt" because the visual estimation alone could not provide sufficient evidence to convict. [*Helke*] at ¶ 46.

{¶ 35} Here, the device utilized by Rustad was specifically identified as an LTI Ultra Light LRB, and the municipal court took judicial notice of this model's reliability based upon the court's own prior findings that this particular laser was scientifically reliable, in Kettering Municipal Court Case No. 15TRD08241, "when it's properly operated and when it's working properly." While Jones argued that the manual for the device requires the officer to stand in the course of its operation if on a motorcycle, he failed to present evidence of the manual's contents. Rustad testified that the device was properly maintained, that he had tested its accuracy on the morning of its use, and that he operated the device in a manner consistent with his training and experience. Jones' first assignment of error lacks merit and is overruled.

{¶ 36} Jones' second assignment of error is as follows:

THE VERDICT IN THIS MATTER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 37} Jones asserts as follows:

* * * [T]he only evidence of Appellant's speed was based upon an estimate of the officer, which estimate is an astoundingly specific 53 mph, not 50, not 55, not 60, but precisely 53 mph. The evidence also showed

that the officer improperly used the device. In contrast, the Court admitted computer evidence presented by the Appellant that his speed was 37 mph. In accepting the unsupported evidence of a human estimate that purports to pinpoint an exact speed over a computer generated real-time recording of the Appellant's speed, the Court clearly lost its way and the decision of the Trial Court must be reversed.

**{¶ 38}** As this Court has previously noted:

A weight-of-the-evidence argument "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009–Ohio–525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit

the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery

No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is

subject to different interpretations does not render the conviction against

the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of

conviction should be reversed as being against the manifest weight of the

evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175,

485 N.E.2d 717.

*State v. Quarles*, 2015–Ohio–3050, 35 N.E.3d 616, ¶ 4–5 (2d Dist.).

{¶ 39} As noted above, the municipal court properly took judicial notice of the reliability of the device used by Rustad, and Rustad's estimate of Jones' speed was not the only evidence of his vehicle's speed before the court. There was also no evidence that Rustad used the device improperly. Although the court allowed Jones to question Rustad on cross examination about the location of the stop as purportedly represented by the "Waze" document, contrary to Jones' assertion, the court did not admit Jones' "Waze" document as evidence of Jones' speed. Finally, the trial court clearly deferred to Rustad's testimony about the condition of the laser device and his use thereof as consistent with his training and experience. Having thoroughly reviewed the record, we cannot conclude that Jones' conviction for speeding is against the manifest weight of the evidence. Jones' second assignment of error is overruled.

{¶ 40} Jones' third assignment of error is as follows:

THE COURT ERRED IN FAILING TO DISQUALIFY THE PROSECUTOR AND THE KETTERING PROSECUTOR'S OFFICE DUE TO A CONFLICT OF INTEREST.

**{¶ 41}** The parties direct our attention to the exchange that occurred on December 3, 2015. Jones asserts that there is a conflict of interest between the role of the Kettering Prosecutor's Office "as a public office serving the public" and its role "as an attorney *for* the Kettering Police Department." Jones asserts as follows:

> In the present matter, the prosecutor indicated only that he was employed by the Kettering Law Department. Further, at the December 3, 2015 original trial date, the prosecutor indicated that the Freedom of Information requests of the Appellant were handled through his office. The prosecutor was blurring these functions to claim that he had complied with a Crim.R. 16 discovery request. * * * Civil and criminal functions were thus combined. Accordingly, the Court should have inquired into the duties of this prosecutor, whether they included duties in both divisions of the Law Department and whether the personnel of the Law Department routinely blur their roles.

**{¶ 42}** The State responds in part as follows:

> * * * It was not error for the trial judge to overrule the motion to disqualify the prosecutor. No actual or apparent conflict existed between the two roles. In fact the Appellant received a "huge stack" of discovery for a minor misdemeanor trial as a result of the dual role of the Kettering Law Department. Therefore, the City of Kettering requests the court overrule this argument and uphold the decision of the trial court.

**{¶ 43}** R.C. 705.11 provides that the "city director of law shall act as the legal advisor to and attorney for the municipal corporation in matters relating to their official

duties. * * * He or his assistants shall be the prosecutor in any police or municipal court * * *."   R.C. 1901.34 provides that the "city director of law * * * for each municipal corporation within the territory of a municipal court shall prosecute all cases brought before the municipal court for criminal offenses occurring within the municipal corporation for which that person is the * * * director or law * * *."   The State correctly directs our attention to *State v. Athon*, 136 Ohio St.3d 43, 2013-Ohio-1956, 989 N.E.2d 1006, ¶ 19, which noted that when "an accused directly or indirectly makes a public records request for information that could be obtained through the prosecutor through discovery, the request is the equivalent of a demand for discovery and triggers a duty to provide reciprocal discovery as contemplated by Crim.R. 16." As the trial court correctly noted and for the reasons set forth above, we conclude that the trial court did not err in failing to disqualify the prosecutor.

{¶ 44} Jones' fourth assignment of error is as follows:

THE TRIAL COURT ERRED IN CONTINUING THE TRIAL DATE OVER OBJECTION OF THE APPELLANT.

{¶ 45} Jones asserts as follows:

The Appellant had filed Brady motions and subpoenas for expert witnesses. The trial was set for this matter on December 3, 2015.   On December 3, 2015, the Court sua sponte continued the trial based on the motions and subpoenas of the Appellant. However, the Appellant withdrew his motions and subpoenas at this hearing and repeatedly demanded to have his trial as scheduled.

What makes the Court's conduct suspect is the fact that the

Complaining Witness, police officers failed to appear for trial. The prosecution made no request for a continuance. Accordingly, the Appellant was denied due process of law.

{¶ 46} We initially note that the record of the December 3, 2015 hearing does not establish, as Jones suggests, that Rustad was not present, but rather suggests that Jones did not recognize him until the prosecutor indicated, "This is the police officer who cited you and stopped you." We further note that in the course of the December 3, 2015 hearing, Jones indicated that "I've just had one road block after another. And *I don't feel like at this point * * I can * * * receive a fair trial* based on the State's * * * inability or unwillingness to cooperate with discovery." (Emphasis added.) Jones further asserted that he wanted an absent expert witness to testify, and the court indicated that it would grant Jones additional time to secure the appearance of the witness and all the material he sought in discovery, so that Jones would have "adequate time to have anybody you want here. And adequate time in this Court to present anything that you would like the Court to consider regarding your defense." Crim. R. 16 governs discovery, and Crim. R.16(L) provides: "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule * * *, the court may *grant a continuance * * *.*" (Emphasis added). Jones' fourth assignment of error lacks merit, and it is accordingly overruled.

{¶ 47} Jones' fifth assignment of error is as follows:

THIS MATTER MUST BE REVERSED DUE TO FAILURE TO PROVIDE DISCOVERY.

{¶ 48} Jones asserts that despite an order from the trial court on December 3, 2015

"to comply with the discovery request including requested Brady material," as of the December 23, 2015 trial date, he still had not received Brady material from the prosecutor. Jones argues that "[s]pecifically, the device used in this incident was represented as having no maintenance issue. Appellant was forced to file a subpoena with the Ohio Calibration Laboratories and discovered that this machine did in fact have maintenance issues." Jones argues as follows:

> The Court dismissed this matter by stating that since the Appellant had independently gotten this information he was not prejudiced by its withholding by the prosecution. However, this is not the case. Due to this failure to supply Brady material, the Appellant was forced to attempt to contact and arrange for expert witnesses at the last moment. Naturally, these witnesses were unable to appear. The Appellant was indeed prejudiced thereby.

{¶ 49} As this Court has previously noted:

> In *Brady* [*v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)], the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. *See also, State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph four of the syllabus; *State v. Aldridge*, 120 Ohio App.3d 122, 145, 697 N.E.2d 228 (2d Dist.1997). Evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the

defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

The rule in *Brady* only applies to evidence unknown to the defendant at the time of the trial. *See United States v. Clark*, 928 F.2d 733, 738 (6th Cir.1991) (no *Brady* violation exists where a defendant knows of essential facts permitting him to take advantage of exculpatory information or where evidence is available from another source); *State v. LaMar*, 95 Ohio St.3d 181, 2002–Ohio–2128, 767 N.E.2d 166, fn. 2; *State v. Buhrman*, 2d Dist. Greene No. 96 CA 145, 1997 WL 566154, *7 (Sept. 12, 1997) ("*Brady's* Due Process disclosure requirement only applies to evidence discovered after trial that had been known to the prosecution, but unknown to the defense").

*State v. Royster*, 2d Dist. Montgomery No. 26378, 2015-Ohio-625, ¶ 16-17.

**{¶ 50}** Jones fails to identify any evidence unknown to him at the time of trial, but rather he identifies available evidence that he was able to obtain from multiple sources. Absent documentation regarding this particular device, a mere oral assertion by Jones that a laser device had been repaired is insufficient to establish prejudice. We note Jones made no proffer. Jones argues that his ability to prepare for trial was impaired (an assertion belied by our analysis of his fourth assignment of error), and he does not direct our attention to material evidence suppressed by the prosecution. " 'Materiality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial.' *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir.1994), citing *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), fn. 20." *State v. Osie*, 140 Ohio St. 3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 154. Jones' fifth assignment of error is

overruled.

{¶ 51} Jones' final assignment or error is as follows:

> CUMULATIVE ERRORS DEPRIVED THE APPELLANT OF A FAIR
> TRIAL.

{¶ 52} As this Court has previously noted:

> Under the doctrine of cumulative error, "[s]eparately harmless errors
> may violate a defendant's right to a fair trial when the errors are considered
> together. * * * In order to find cumulative error, we first must find that multiple
> errors were committed at trial." *State v. Harris*, 2d Dist. Montgomery No.
> 19796, 2004-Ohio-3570, ¶ 40. "A conviction will be reversed when the
> cumulative effect of errors in a trial deprives a defendant of a fair trial even
> though each of the numerous instances of trial-court error does not
> individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d
> 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, *citing State v. DeMarco*, 31
> Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

*State v. Griffith*, 2015-Ohio-4112, 43 N.E.3d 821, ¶ 49 (2d Dist.).

{¶ 53} Having found no errors, we conclude that Jones' sixth assignment of error
lacks merit, and it is accordingly overruled.   The judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, J. and WELBAUM, J., concur.

Copies mailed to:

John D. Everett
George A. Katchmer
Hon. Jay Newberry,
Acting Judge